[Civ. No. 12545. Second Dist., Div. One. Sept. 17, 1941.]

GAIL J. BURCK, Respondent, v. G. C. BUCHEN et al., Appellants.

Robert A. Jarrott, Arthur C. Miller and Lee A. Solomon for Appellants.

Paul J. Fritz for Respondent.

YORK, P. J.—This action involves a forged promissory note for $25,000 dated March 21, 1938, due ninety days after date with interest at 6% per annum, in favor of George D. Smart and purportedly signed by Louis B. Mayer. On the reverse side of the note was a written guaranty of payment signed by the payee and a certificate of acknowledgment of appellant Buchen, a notary public, to the effect that on March 21, 1938, both Smart and Mayer personally appeared before him and acknowledged the execution of said note. As a matter of fact Mayer was not present when the acknowledgment was taken.

Respondent Burck purchased the note for the sum of $22,500 on April 5, 1938, under the following circumstances: The investment house of Cavanaugh-Morgan Company, of which Emerson Morgan was a partner, had been acting as brokers for respondent in the liquidation of a large block of stock in a closed corporation which was listed only on the Chicago Stock Exchange. This transaction took nearly four months to complete and during this period respondent was in and out of the Cavanaugh-Morgan office consulting with Mr. Grigg, an associate of said company, who introduced him to Mr. Morgan on March 22, 1938. On that day a conversation took place in the office of Mr. Morgan in which respondent, Mr. Morgan and George D. Smart participated, and with respect to which respondent testified as follows: "If I recall it properly, Mr. Morgan first outlined generally the terms of the . . . transaction, which were that Mr. Smart was the personal representative of Mr. Louis B. Mayer, head of the M-G-M Studios; that, as such, Mr. Smart had been commissioned by Mr. Mayer to negotiate a personal contract between the M-G-M Studios and an artist named Charles Laughton, which contract was to contain a personal paragraph making the contract completely subject to Mr. Mayer's personal con-

trol. It was stated for that reason Mr. Mayer was taking an unusual method of financing rather than to go to his bankers, for the reason that his own bankers were also officers and directors of M–G–M and it was impossible for them to know his proposed transaction if he expected any success; hence, that Mr. Mayer had executed the note for $25,000, which he had entrusted to Mr. Smart for the purpose of raising moneys to carry out this transaction; that, generally the plan was that Mr. Smart, as Mr. Mayer's agent, would negotiate with Laughton's agent in New York City, with a deposit of the $25,000 in escrow as a good faith covenant, which sum would eventually be turned over to either the agent (or) Mr. Laughton when the contract with the proper transaction in it was duly signed. There was a further problem and consideration in the whole deal, in that Mr. Laughton was at that time subject to certain income tax controversies with the United States Government and was in England and was afraid to come back to the United States until the income tax problems were fixed up. M–G–M Studios were to act as Mr. Laughton's attorneys, that is, their attorneys would act as his attorneys in straightening out that income tax controversy as a further consideration for this contract. Then, Mr. Smart corroborated various details of that plan and exhibited to me at that time various documents indicating his status as the special agent and personal representative of Mr. Mayer, letters purporting to be signed by Mr. Mayer and so forth. The note was then presented to me for my inspection. . . . I looked it over and told them that I would consider the proposition and would let them know the next day. Mr. Morgan also at the same time explained to me his connection with the transaction. It seemed that Mr. Smart, as agent who would obtain the contract for M–G–M, would be entitled to the usual ten per cent agent's commission. This was to be in large figures and the commission, if I understand it, would run around a hundred thousand dollars; that Smart had agreed with Morgan, in that if Morgan could help him finance this note that he, Smart, would split his commission in some manner which I do not recall with Morgan; in other words that Mr. Morgan was to participate in Smart's commission when and if the transaction was consummated in consideration of Morgan's

effort to finance the note. . . . I was to pay $22,500 for the note in full. It was stated that Mr. Morgan, as a part of his own transaction with Mr. Smart, as well as financing the note, was to put up $2500 of his own money . . . as an advance to Smart for necessary immediate expenses and other details of the transaction." He further stated it was his understanding that $22,500 was to be put up by him and $2500 was to be paid by Mr. Morgan, so that Smart received $25,000, the face of the note, and that Mr. Morgan was to receive a cut-in on the commissions or part of the benefits that Smart was to receive for negotiating the contract with Mr. Laughton. Respondent took the note home with him to discuss it with his wife, and the next day returned it to Mr. Morgan and "I told Mr. Morgan that we would not take the deal at that time for the reason that it was too much money involved but that if he wanted us to we would take half of the deal." Respondent was asked regarding any conversation he might have had relative to the acknowledgment which appeared on the promissory note, to which query he made the following response: "It is my recollection that in the first conversation at the time that the note was originally presented to me it was explained the circumstances under which the notarial acknowledgment had been placed on the note. . . . Mr. Morgan stated that . . . Mr. Smart had originally presented to him a similar note on which a notarial seal had been placed but in the form of a verification rather than an acknowledgment and that Morgan's attorneys had advised him that an acknowledgment was the preferable form of notarization, so he had asked Mr. Smart—this was presumably several days prior to the time I had heard about it—to have a new note executed and acknowledged by Mr. Mayer before a notary . . . and Mr. Morgan told me that Mr. Smart had done this the night before I met him, in other words on the 21st of March; that Mr. Smart and Mr. Mayer had arranged the notarization through Mr. G. C. Buchen and that the notarization on the note was that of Mr. G. C. Buchen. . . . I believe they told me something of the details of the time and place it was done. It was done in the evening, so I believe they had to ask Mr. Buchen to come especially to his office for the occasion."

On April 5, 1938, respondent purchased a cashier's check at the Canadian Bank of Commerce in Los Angeles for $22,-

500 in favor of George D. Smart which he delivered to Mr. Morgan in payment for the note.

Upon cross-examination, respondent admitted he knew Mr. Morgan was continuously investigating the note during the period from March 22nd to within a few days of April 5th, and at the time he bought the note "I knew that he (Mayer) had not personally appeared in Mr. Buchen's office. I knew, however, that Mr. Buchen was satisfied with his acknowledgment. Q. You did not talk to Mr. Buchen? A. No. Q. You mean Mr. Morgan represented to you that Mr. Buchen was satisfied? A. Yes. Q. Well, as a matter of fact, prior to April 5, 1938, the date on which you bought the note, you had ascertained that Mr. Morgan was so little satisfied with what Mr. Buchen had told him that he had, in fact, endeavored to contact Louis B. Mayer personally? A. I knew that he did that, yes. . . . Q. At least you did not rely on the statements contained in the acknowledgment itself, did you, Mr. Burck, which was to the effect that on this 21st day of March, 1938, before me, G. C. Buchen, a Notary Public in and for the County of Los Angeles, State of California, personally appeared George D. Smart and Louis B. Mayer, known to me to be the persons whose names are subscribed to the within instrument and so forth? A. No; I knew that Mr. Mayer had not personally appeared before Mr. Buchen. Q. So you knew that in so far as that statement was concerned in the acknowledgment that it was untrue? A. Yes. Q. And that prior to the date that you bought the note? A. Yes."

On July 8, 1938, respondent learned that the signature of Mr. Louis B. Mayer was a forgery, and in a criminal prosecution which was thereafter instituted against George D. Smart, the latter admitted this note was one of a series of notes forged by him.

From the judgment which was entered against the notary public Buchen for $22,500, and against his surety for $5,000, that being the amount of the indemnity bond, this appeal is prosecuted upon the grounds: (1) that the evidence is insufficient to support the findings of the trial court that respondent relied upon the notarial certificate endorsed upon the note by appellant Buchen, and that respondent was not guilty of negligence or contributory negligence directly and

proximately causing the damage sustained by him; (2) that respondent was both careless and negligent and guilty of contributory negligence which was the proximate cause of his loss as a matter of law; (3) that the court erred in denying appellants' motion for new trial.

It is urged by appellants in support of their first point that the testimony of respondent "was undisputed. That his admitted knowledge that he had actual notice with respect to the falsity of the recital contained in the acknowledgment, and his statements showing actual notice as to the other things which cast doubt on the authenticity of the signature, definitely contradicts the findings of fact on which the trial court based its judgment herein."

It is contended by respondent that (1) a notary public and his sureties are liable for all damages proximately sustained from official misconduct or negligence of the notary public; (2) a person damaged as a result of the misconduct or negligence of a notary public may recover, even though such misconduct or neglect is not the *sole* proximate cause of the injury. (Emphasis included.)

Section 801 of the Political Code provides: "For the official misconduct or neglect of a notary public, he and the sureties on his official bond are liable to the parties injured thereby for all the damages sustained."

When taking an acknowledgment, "the officer should require the acknowledging party to appear in person before him, as he is required to certify that such party 'personally appeared.' (Sec. 1189, Civil Code.) If an instrument is acknowledged in violation of this rule, as where it is acknowledged through a telephone, the officer would undoubtedly be liable in damages if it should turn out that it was acknowledged by an imposter." (1 Cal. Jur. 247.)

However, in order "To render the officer liable for damages, it is, of course, necessary that his act in taking an acknowledgment be the proximate cause of the damage sustained (*Joost* v. *Craig,* 131 Cal. 504 [63 Pac. 840, 82 Am. St. Rep. 374] ; *Hatton* v. *Holmes,* 97 Cal. 208 [31 Pac. 1131]), and, where the right of action is founded on the negligence of the officer, *that the plaintiff be not guilty of contributory negligence.* (*Anderson* v. *Aronsohn,* 181 Cal. 294 [184 Pac. 12, 10 A. L. R. 866] ; *Overacre* v. *Blake,* 82 Cal. 77 [22 Pac. 979] ; *Oakland Bank of Savings* v. *Murfey,* 68 Cal. 455 [9

Pac. 843]; *Brown* v. *Rives,* 42 Cal. App. 482 [184 Pac. 32].)
This rule does not render it necessary that the misconduct or
neglect of the notary be the *sole* proximate cause of loss.  In-
deed, an instrument cannot be used as a means of defraud-
ing anyone until used in some transaction entirely outside the
official duties of the notary.  For this reason, the right of
action is not dependent upon a showing that the acts of others
have not contributed to the injury, or defeated by a showing
that they have so contributed, if it appears that the party
defrauded relied on the notary's certificate.  (*Homan* v.
*Wayer,* 9 Cal. App. 123 [98 Pac. 80].)  On the other hand,
if notwithstanding the negligence of the notary, the interven-
ing negligence of another is the direct cause of the loss, the
notary is not liable."  (1 Cal. Jur. 297, section 51.)  (Em-
phasis added.)

Appellant Buchen testified with respect to the cir-
cumstances under which he certified the acknowledgment of
Louis B. Mayer to the note in question as follows:

"I was called on the telephone . . . around 9:30 that
evening (March 21, 1938) by . . . a man that I had known
for about fifteen years, and he asked me as a special favor
to go to the office, that one of his clients had a party that
wanted to meet me there for an acknowledgment that evening
and it was a matter that had to be attended to on account
of him going to Washington, D. C., and it had to be ac-
knowledged that evening;" that he left his home in Glendale
and went to his office at Third and La Brea, Los Angeles,
where he met "a man that introduced himself as Mr. Smart,"
who handed appellant a card which showed he was connected
with the sound department of Metro-Goldwyn-Mayer Corpo-
ration, but he explained that "he was actually Mr. Mayer's
confidential secretary and then he went on to explain about
this note and the reason why he was going to Washington,
to handle some confidential matters for Mr. Mayer and
showed me a letter written on . . . Metro-Goldwyn-Mayer
stationery with his (Mayer's) signature attached to it. . . .
I told him . . . the promissory note with Mayer's signature
on it should be good without an acknowledgment . . . but
he (Smart) said in this particular case . . . this note was
given him in remuneration for certain services he was to
render for Mr. Mayer in Washington and that in case any-

thing happened to Mr. Mayer he wanted the signature acknowledged because there might be some dispute about it because of its confidential nature and that he might not be able to claim on the note if the signature was not acknowledged. That is the reason he gave me. . . . I asked him why he didn't bring Mr. Mayer to the office with him and he said Mr. Mayer was in another important meeting and it would be impossible to get him there but he would contact him by telephone, so I suggested that he call him on the telephone and have me talk to him and he dialed the number and turned the receiver over to me . . . and I asked the party at the other end if he was Louis B. Mayer and he said he was. He said that he was Mr. Mayer and I told him the purpose of the call was to—Mr. Smart was in the office and had a note there to the amount of $25,000, asking for me to acknowledge the signature, and asked him if he had signed the paper and it was o. k. for me to acknowledge it, and he said that that was o. k. but to keep it confidential.'' The witness Buchen further testified that on either the 22nd or the 23rd of March, Mr. Morgan walked into his office, ''pulled the note out of his pocket and laid it on the desk and asked me if Mr. Mayer was there personally when that note was acknowledged.'' Mr. Buchen said he then related to Morgan ''just the facts as they occurred the night before; that Mr. Mayer was not there personally and that Mr. Smart had come there and asked me to acknowledge that signature and I just explained it as I have here, that I talked to him supposedly on the telephone.'' Appellant testified that later in the day Mr. Morgan telephoned him and told him his connection with Cavanaugh-Morgan Company and that he was interested in the purchase of the note and wanted to be satisfied before he advanced any money on it, whereupon Mr. Buchen suggested that he would do his best to contact Mr. Mayer personally; however he was unable to reach him personally, and ''finally Mr. Morgan told me that they had been able to contact Mr. Mayer; they had been in correspondence with Smart back east and through Mr. Smart's connection here they were able to contact Mayer and that they were satisfied that everything was all right . . . he said that Mr. Smart had made a contact for him with Mr. Mayer by long distance some way and that he had talked to Mr. Mayer and that they were satisfied that the note was o. k. and for me to just forget it.''

There was introduced in evidence the deposition of George D. Smart which contained the following testimony: ''Mr. Buchen came to his office and I met him there and I presented him with this note and asked him to acknowledge the signature thereon. And he, of course, told me he couldn't do that, because the man wasn't able to make his appearance, but after I talked to him for fifteen or twenty minutes, and explained the inadvisability of a man of this type running around nights to have his signature o. k.'d, and so I told Mr. Buchen that I would arrange for him to talk to Mr. Mayer over the telephone, which I did supposedly. I had him call a number, and he thought he was talking to Mr. Mayer. He reluctantly acknowledged the signature as that of Mr. Louis B. Mayer.'' He also testified that Mr. Morgan ''took every precaution that was humanly possible, excepting to contact Mr. Mayer . . . Mr. Morgan had also taken this note, and other notes, to certain banks in Los Angeles who had copies of Mr. Mayer's signature, and they had stated that in their opinion it was Mr. Mayer's signature. . . . Mr. Morgan explained to Mr. Burck that we were attempting, or that I was attempting, rather, to settle back income taxes for Mr. Charles Laughton, who was at that time in England; and that if these taxes could be settled judiciously, and without any trouble, that . . . I would receive a contract from Mr. Laughton which would in turn be given to Mr. Mayer or to Metro-Goldwyn-Mayer, which would involve quite a sum of money; it would be over a period of three years; and for settling these taxes, and for negotiating this contract, I was to receive 10% of the face of the contract . . . to be shared between Mr. Morgan and myself.''

With respect to the certificate of acknowledgment on the note, Mr. Morgan testified as follows: ''The only investigation I made on that note was after the note was notarized. I dropped by Mr. Buchen's office on a Wednesday or Thursday morning following the March 21 conference and asked Mr. Buchen if that was his notarization. He admitted it was was and I asked him if Mr. Mayer was present and he wanted to know who I represented and what my questions were for, whether or not any money had been advanced on the note and I told him a considerable amount of money had been advanced on the note and it was a pretty serious affair if

the proper persons had not appeared before him. He refused to give me much information and later that afternoon I called him on the telephone . . . at which time, I believe, he realized the seriousness of it and I don't know whether it was over the 'phone or whether I dropped in to see him again but at that time he was . . . convinced that a hoax had been played and said that . . . he had not dialed the number himself when he supposedly talked to Louis B. Mayer. I asked him if he would get in touch with Louis B. Mayer for confirmation, at which time he said he would write a letter to Mr. Mayer. I called him several days later and he had had no reply. It was at that time that I called long distance or sent a wire to Mr. Smart (who was then in New York), and he (Smart) called me long distance Friday night and told me that the reason that Mr. Buchen would not make any admission one way or the other was because he was in the employ of Mr. Mayer and had his instructions, but he said if I would go to Mr. Buchen at 10 o'clock Saturday morning . . . April 2, that Mr. Buchen would talk to Mr. Mayer over the 'phone and confirm the notarization. . . . He said 'Have Mr. Buchen call the Metro-Goldwyn-Mayer Studio and call for L. B. 7646—that is Louis B. Mayer's private number.' I dropped by on a Saturday morning at 9 o'clock and Mr. Buchen was not in his office and I tried again at 9:45 and he was not in his office, so I called from our office—called Republic 0211, which is the Metro-Goldwyn-Mayer number—called for L. B. 7646 and was—got switched onto a voice that purportedly was Louis B. Mayer, at which time Mr. Garrett in our office listened in. . . . I asked if he was Mr. Mayer, which he said he was. I stated I was calling in behalf of Mr. Buchen, who was out, regarding authenticity of the note, which he stated—then Mr. Mayer stated was valid and which he would sign." As a matter of fact, it is shown by the record that this telephone conversation was not with Mr. Mayer but with a confederate of George D. Smart.

While it must be conceded that appellant Buchen was guilty of negligence in acknowledging the purported signature of Mr. Mayer without requiring the latter's personal appearance before him, it is admitted by respondent Burck that he had actual notice of this fact before he purchased the note. Respondent's reliance upon the notarial certificate

in the face of his actual knowledge that it had been irregularly executed constituted negligence which proximately contributed to his loss.

The entire transaction was surrounded by facts and circumstances sufficient to have aroused the suspicions of any ordinarily prudent person. In the first place, a promissory note is not required by statute to be acknowledged; second, the purported agreement, pursuant to which the note was executed and which was narrated to respondent by Mr. Morgan and Mr. Smart, was one which cast "aspersions" upon the character and integrity of a man standing practically at the head of the motion picture industry in this state; third, the offer to sell this 90-day note with interest at 6% at a discount of $2500 was calculated to appeal to the cupidity of prospective purchasers, and thus to allay suspicion as to its authenticity.

The evidence clearly establishes the fact that respondent's negligence proximately contributed to his loss, and is therefore insufficient to support the findings of the trial court which formed the basis of the judgment.

The judgment is reversed.

Doran, J., and White, J., concurred.