[Civ. No. 14412.   First Dist., Div. One.   Sept. 26, 1950.]

EVELYN T. JORDAN, Appellant, v. JANE O'CONNOR,
Defendant; MASSACHUSETTS BONDING AND IN-
SURANCE COMPANY (a Corporation), Respondent.

Phil F. Garvey, Francis C. Starr and James A. Himmel for Appellant.

Worthington, Park & Worthington and Leonard A. Worthington for Respondent.

WOOD (Fred B.), J.—This is an appeal by plaintiff from a judgment for defendant in an action against a notary public and her surety for damages for alleged negligence of the notary in taking and certifying the acknowledgment of the signature of the maker of a deed of trust. The notary died after commencement of the action, which proceeded to trial against the surety only, before the court without a jury.

The deed of trust, according to its terms, was executed by one Marie Russell as trustor to secure payment to appellant of indebtedness evidenced by a promissory note for $1,200 executed by trustor, and to secure any additional sums which appellant might thereafter lend the trustor. It was dated July 6, 1946.

The certificate of acknowledgment, executed by defendant Jane O'Connor as notary public, read as follows: "On July 10th 1946, before me, Jane O'Connor, a Notary Public, in and for said City and County and State, personally appeared Marie Russell, a married woman, known to me to be the person whose name is subscribed to the within instrument, and acknowledged that she executed the same."

The promissory note bore date July 6, 1946, was purportedly signed by Marie Russell as maker, in favor of appellant as payee; was in the principal sum of $1,200, payable one year after date; bore interest at the rate of 6 per cent per annum, payable monthly, and recited that if any of the interest were not paid within 10 days after it became due, the whole of the principal sum would forthwith become due and payable at the election of the holder, without notice.

A second promissory note, dated October 9, 1946, likewise was purportedly signed by Marie Russell in favor of appellant as payee; was in the principal sum of $700, payable 90 days after date; and bore interest at the rate of 8 per cent per annum, payable at maturity.

The signature to each of these three instruments was a forgery. Marie Russell, the owner of the property described in the deed of trust, had no knowledge of the transaction. She neither signed nor did she authorize anyone to sign her name to any of these instruments; nor did she ever appear before the notary or acknowledge the signature to the deed of trust as her signature. It is not known who signed any of the documents; nor who, if anyone, appeared before the notary and acknowledged the signature to the deed of trust.

Appellant claimed that she made these loans in reliance upon the security of the deed of trust and the notary's certificate of acknowledgment of the trustor's signature, that the notary was negligent in taking and certifying the acknowledgment, and that such negligence was the proximate cause of her loss of the money loaned and certain costs incurred in unsuccessfully attempting to enforce the security given for the loan.

The court found that it is not true that appellant loaned the signer of said notes and deed of trust $1,900 in reliance upon the security mentioned in the deed of trust and the signatures and acknowledgment on said instruments; that appellant did not rely on the notary's acknowledgment in making any of the alleged loans; that appellant did not alter her position to her detriment based on the actions of the notary;

that appellant did not suffer loss or damage as the result of the actions of the notary nor did she place any trust or reliance on the notary's acknowledgment to the deed of trust; that appellant suffered no damage as a result of negligence of the notary; that the deed of trust was not made as security for the $1,200 note; and that the alleged loan was made, if at all, four days prior to the notary's acknowledgment on the deed of trust, therefore no reliance was placed by appellant on the notary's acknowledgment.

Appellant claims that these findings are not supported by the evidence; also, that the court erroneously failed to make findings on certain material issues.

The alleged loans were made at the request of one Lyman Russell. Marie Russell, his wife, was the purported grantor of the deed of trust and maker of the promissory notes. Lyman Russell was a real estate broker who handled loans and mortgages for clients. Appellant testified that he had been her broker for over 10 years and had invested considerable sums of money for her. The usual procedure in making a loan was for Russell to make the contact, collect the data and give it to appellant. She or her mother would inspect the property, get Russell's advice and then decide whether to make the loan. Payments on these loans were made to Russell and he would send them to appellant. Sometimes he would let the payments "bank up three or four months" before remitting to her. Appellant claimed that the money purportedly loaned to Marie Russell came from collections which Russell had made and held for appellant's credit in his office.

The only written statements or reports from Russell to appellant prior to July 1946, as to which appellant testified, were statements made in August 1945 and in February, March and May 1946, in which he reported and remitted collections of $146.28, $250.29, $134.37, and $185.35, respectively. No earlier statements of his were offered in evidence. No later written accounting was made by him except one in October 1946, reporting and remitting a collection of $25.

When Russell made no payment to her in July of 1946. she called it to his attention and he said he would get everything in order and take care of everything the first of the year. She was "anxious to get everything all fixed up," "wanted to get out of this," and he assured her he would have his accounts in order the first of 1947. He stated he was not in good health and was going to curtail his activities in this

field after the first of the year. From May 1946 until his death in January 1947, he gave her no statements or accounts, except that of October 1946, relying on the fact that his wife, as appellant understood it, was to inherit some money and he was counting on this money to clear up all his accounts and get them all in order and have a general accounting on the first of the year. He asked her to lend his wife, Marie Russell, $1,200 out of the money he had on deposit, and appellant did that. The $700 loan made in October 1946 was likewise made at Russell's request and from the same source.

As to the amount of her money that Russell actually had on deposit when the $1,200 loan was made, appellant did not know how much more than $1,200 it was; that up until May 1946 he rendered reports to her. In that month the report showed, she stated, he had about $1,400 on hand for her credit; and then, she said, it was not in cash, it was $1,400 outstanding, due on other accounts, she did not have a statement on that now but she could make it up. Later, she testified that over $1,400 had been there for two years, which he had not invested for her, was holding for a two-year period. From papers in her possession, she testified that the money he had on hand to her credit was $3,150, in May and also on July 7, 1946, made up of various sums which he had collected and not paid over to her. These included collections of $350, $193, and $314, made in 1942, 1943, and 1944, which he never reported to her, one of which he effected through the medium of a forged substitution of trustees which she learned about after his death; another collection of $350 in 1942; one of $407 in 1944, in connection with which she stated he forged a substitution of trustee; and collections of $1,320, $214, $106, and $232, the dates of which do not clearly appear.

When asked what money, on any of those accounts, Russell actually collected in June of 1946, appellant replied that all of this came to light after he passed away; in January (1947) he was supposed to clear all of this up, and get it all cleared, so she could not have any more business like this; when he passed away she had to go into it very thoroughly; she contacted all these people and found they had paid him different amounts of money that he made no record to her of, and altogether her loss on all those properties stands well over $3,000.

Yet, in another part of her testimony appellant said that just prior to the making of this $1,200 loan she had a conversation with Russell as to the amount of her money he had on

hand in his possession at that time; that he said he had over $3,150. In response to a question whether she then discussed with him the source of those funds, from whom he collected them, and as to the various accounts, she replied: "The accounts that I have listed, that he gave the itemized list of moneys due of the amount he had on credit in his office"; that she discussed those accounts with him and the various payments he had received. These are the very accounts substantial items of which she had earlier testified were unknown to her until after his death.

Although appellant several times stated positively, as if of her own knowledge, that Russell had more than sufficient money of hers to make these loans of $1,200 and $700 (using such expressions as "I know the money was in the office," "he had the money," "It was on deposit"), she admitted, when pressed by respondent's counsel for an answer, that all she knew was that there was a credit in her favor on her account for that money, she did not know whether he actually used that money himself or not. The following questions by the court, and her responses, are significant: "Q. Let me ask you this: Isn't it true that all you had, all you knew about it was that as far as the accounts were concerned and considering the date on which payments should have been made, that Mr. Russell should have had in his possession $3,150 that belonged to you? A. Yes. Q. You don't know whether he actually had it or not? A. I know he had some of it, your Honor, because different accounts had been settled. Q. I mean, now, you know that he should have had, but whether he actually did have it—— A. He told me he had it. Q. But you don't know? A. That was the reason, your Honor—— Q. Disregarding what he told you, now, for a minute, you really know nothing about it excepting that those accounts should have been paid and he should have had the money upon the dates when the payments should have been made, that he should have had the money in his possession, is that right? A. Yes."

It was after he told appellant how much he had on deposit for her account that Russell mentioned this particular loan to Marie Russell, and the San Bruno property to secure it, telling her that Marie Russell was his wife and the owner of that property. Concerning the $1,200 loan, appellant upon cross-examination said that she was not at the time familiar with the signature of Marie Russell; that she relied on Mr. Rus-

sell's statements to her that it was Marie Russell's signature. When the $1,200 note was given her on July 6, appellant took his word that that was Marie Russell's signature. The same condition existed with reference to the second note. Appellant was not familiar with the signature of Mrs. Russell and merely took Mr. Russell's word. Later, upon redirect examination she said that in making the $1,200 loan she relied on the security of the deed of trust, would not have made that loan without the security of the deed of trust.

Upon cross-examination, she stated she did not recall having any conversation with Mr. Russell, prior to accepting either of those two notes, regarding the existence of a mortgage on the San Bruno property. Later, upon redirect examination she stated that the $1,200 note was to be secured by a second deed of trust against the San Bruno property. It was to be secured by a deed of trust subject to a first mortgage of the Hibernia Bank, which was already on the property.

As to the time and sequence of delivery of the notes and deed of trust, appellant testified that she received the deed of trust after it was recorded, and received those two promissory notes at the same time. Later, she did not remember when she first saw the deed of trust, nor if she saw it before the first note was executed; imagined it was given to her at the time the note was given; did not know whether she received the deed of trust and the note at the same time, but was quite sure she did; the deed of trust was delivered to her after recordation July 16, whether by the title company or Mr. Russell she did not remember; did not remember whether the notes and deed of trust were delivered to her at the same time or different times; all eventually came into her possession after July 16; did not remember whether she herself recorded the deed of trust; did not know whether the first note was handed her by Mr. Russell or if it was mailed to her; she imagined it was handed to her.

Despite appellant's claim that Russell held $3,150 of her money from May 1946 on, he made no loans for her after that, outside of the two loans to Marie Russell. Also, after May 1946 she received no money from him, except the $25 collection in October 1946; and no money from his wife or any other person on his behalf. Yet, she let him hold the difference between $3,150 and $1,200 in July, and the difference between $3,150 and $1,900 in October and subsequently. Russell did not tell her what he was doing with that money of hers which he was holding.

Although the $1,200 note called for interest payments monthly, with acceleration of the principal if any interest payment became delinquent for 10 days, appellant never made any demand upon either Mr. or Mrs. Russell for payment of principal or interest on either note until after Mr. Russell's death, at a meeting of appellant and Mrs. Russell with their attorneys in February 1947.

The unusual character of this lending transaction, the circumstances attending it, and the uncertainties and conflicts in appellant's testimony, it would seem, prompted the trial court to ask the following questions of appellant: ''Just tell me this, Mrs. Jordan, how did this transaction come about? How did you happen to loan him this $1200 and this $700? Was it at his request? A. Yes. Q. Did you feel you [he?] might not have had the money for it? A. No, we had no idea, your Honor. Q. What did he say he wanted it for? A. He wanted us to lend the money on property owned by his wife and, as I said before, we were going to close all dealings on the first of the year and he had this money on deposit. Q. Is that what he told you? A. Yes, he told us definitely. Q. Did he tell you that he had $3,150? A. He had $3,150. Q. He said, 'If you will loan me $1200——' MR. GARVEY [counsel for appellant] : Not him, your Honor; Marie Russell. THE WITNESS: Yes, Marie Russell, not to lend him the money, out of the money he had on deposit, and we did that. THE COURT: Q. Then when he paid no interest on this $1200 between then and the time you made the loan of $700, did that raise any question in your mind? A. No, because his health was so poor and he was so anxious himself to close up all his dealings and he was going to make a general accounting on the first of the year. Q. Didn't you say, 'Well, all right, I will loan you this money and you turn the balance over to us now, there is no use to have it in your office'? A. No, we didn't go into that at all, because we had trusted him, your Honor, we had dealt with him over a period of ten years.''

These further questions and comments by the court are of similar significance: ''Q. Didn't you question it at all when these checks failed to come in? A. No, because we had known that he was in poor health and that he had told Mother that he was going to get out, because his health was so bad and so we just—due to his past record of good judgment and handling money over a period of ten years, we had no occasion to question any dealings at all. Q. Let me ask you this:

When you took this note for $1200, why didn't you take a note at that time for all that was remaining due, instead of just part of it—all that, according to your figures, that he owed you?'' This question was not answered by appellant. Her attorney interrupted to say and did say: ''May I explain to your Honor, that wasn't the transaction at all. I think your Honor has misconceived all this transaction here. This was not a transaction whereby he was giving her a note and security for any balance that she may have had on deposit with him there. The transaction was this——'' Thereupon the court made this comment: ''According to the testimony that is in the record—we are getting down to the truth of this thing—I would like to find out why all of a sudden this transaction came up in this way. In other words, here this lady had $3,150 that was supposed to be in his hands and all at once he comes and wants to borrow $1200,'' and asked this question: ''Was that his suggestion or yours?'', to which appellant responded, ''It was his.''

Concerning Russell's statements of account to appellant, the court asked appellant: ''Well, Mrs. Jordan, let me ask you this question: Q. Were these statements by Mr. Russell—they were made each month, were they, over a period of time? A. Over a period of time, they were rendered about every other month, they were given. Q. Were they to bring you up to date, were they statements—wasn't in effect Mr. Russell saying, 'I have collected this much money; this is what belongs to you and this is what I am turning over to you'? A. No, we understood he was holding other money in his possession for deposit to our account.'' The court continued with the following inquiries: ''Let me ask you this question: Was there any account rendered by Mr. Russell to you which gave you information how much he was holding for you, or were you, as you might say, in the dark as to how much he was holding for you? A. We knew pretty well what he had on deposit. Q. But he didn't render you any regular accounts to show you? A. No. Mr. Garvey: Your Honor will recall the testimony of the witness that he did acknowledge he had on hand a certain amount. The Court: I recall that. I am talking about these statements, I am just asking her if he rendered regular statements which indicated to her how much he was holding for her, from time to time. A. At the time—if I may go on to help you a little bit—at the time these loans were made, he told us that he had a definite amount of money on deposit for us, and for that reason asked if he

could use $1200 of the money he had on deposit on this new loan and again, in October, the additional $700. THE COURT: I understand that was your testimony. It was his proposal. A. Yes.''

It is apparent that appellant's testimony did not convince the court that the transaction was as claimed by her. Proof was lacking that Russell actually had on hand sufficient money, or any money, of hers to make the purported loans to Marie Russell. Appellant's conduct and testimony support the conclusion that appellant relied upon her own agent in entertaining and consummating this transaction, upon him to make out the necessary papers, and upon his assurance, not the notary's certificate of acknowledgment on the deed of trust, that trustor's signature and the signatures on the notes were genuine. The evidence further supports the conclusion that appellant's loss, if any, occurred prior to and independently of this transaction, as a result of the conduct of her agent, Russell.

Appellant directs attention to the fact that appellant's testimony is not contradicted by that of any other witness and invokes the general rule that the testimony of such a witness may not be disregarded but should be accepted by the court or jury as proof of the facts adduced by that witness. This rule has its exceptions. Conflicts in the testimony of a witness must be resolved by the trier of the facts. The most positive testimony of a witness may be contradicted by inherent improbabilities as to its accuracy contained in the witness's own statements. There may be circumstances in evidence in connection with the matter which satisfy the court of the inaccuracy or falsity of that testimony. The manner of the witness in testifying may impress the court with a doubt as to the accuracy of his statement and influence it to disregard the witness's positive testimony as to a particular fact. It is the province of the trial court to determine what weight shall be given to the testimony of any witness. An appellate court cannot control the finding or conclusion of the trial court denying the testimony credence, unless it appears that there are no matters or circumstances which impair its accuracy. (*Young* v. *Tassop*, 47 Cal.App.2d 557, 561 [118 P.2d 371], and cases therein cited.)

We conclude that the findings challenged by appellant are supported by the evidence, except the finding which seems

to predicate appellant's nonreliance upon the notary's acknowledgment upon the fact that the loan was made, if at all, four days prior to the acknowledgment. This exception does not affect the other findings, which are amply supported by the evidence.

Appellant claims error for asserted failure of the court to find that Marie Russell did not sign the deed of trust and that her purported signature thereto was forged. This was fully covered by a finding which, by declaring true the allegations of paragraph IX of the complaint, found that the signatures of Marie Russell on the trust deed and the promissory notes were forged and were not genuine signatures.

Appellant also asserts error of the court in declining to find that at the time the notary took the acknowledgment she did not know whether the person making the acknowledgment was the person described in the trust deed and did not know whether or not the person named therein executed the same and that the notary did not procure satisfactory or any evidence or information to show that the same was named therein as trustor. The court predicated this declination upon the fact that no evidence was presented covering these allegations. This failure to find, whether correct or not, is immaterial in view of the findings to the effect that the act of the notary was not a causative factor in effecting appellant's loss.

Appellant suggests that the court erroneously found "That the notary was not guilty of official misconduct and negligence." The record does not disclose any such finding.

The authorities upon which appellant relies correctly hold that for the official misconduct or negligence of a notary public he and the surety on his official bond are liable to the persons injured thereby for all the damages sustained. But those authorities are not applicable here for in each it appeared that the plaintiff had parted with his money in reliance upon the notarial certificate and that the notary's negligence or official misconduct was the proximate cause of his loss. While the notary's act, if relied upon, need not be the sole cause (*Homan* v. *Wayer,* 9 Cal.App. 123 [98 P. 80]; *Inglewood Park M. Co.* v. *Ferguson,* 9 Cal.App.2d 217 [48 P.2d 305]), it must be an efficient cause of the loss (*Overacre* v. *Blake,* 82 Cal. 77 [22 P. 979]; *McAllister* v. *Clement,* 75 Cal. 182 [16 P. 775]; *Burck* v. *Buchen,* 46 Cal.App.2d 741, 746 [116 P.2d 958], and cases cited; *White* v. *Rosenstein,* 8 Cal.App.2d 217 [47 P.2d 358]; *Riverside P. C. Co.* v. *Maryland C. Co.,*

46 Cal.App. 87 [189 P. 808]). Where, as here, the act of the notary was not an efficient cause of the loss, if any, sustained, there can be no recovery from the notary or her surety.

The judgment is affirmed.

Peters, P. J., and Bray, J., concurred.