[No. C003667. Third Dist. Feb. 15, 1990.]

KIRK CORPORATION et al., Plaintiffs and Appellants, v. FIRST AMERICAN TITLE COMPANY et al., Defendants and Respondents.

**COUNSEL**

Richard Lindstrom for Plaintiffs and Appellants.

Riley, Combellack & Driscoll, Patrick J. Riley, Miller, Starr & Regalia and Edmund L. Regalia for Defendants and Respondents.

---

**OPINION**

**DAVIS, J.—**

## INTRODUCTION

This appeal involves a commercial lease to operate a bar and restaurant in one unit of plaintiffs' Kirkwood Tower "Whiskey Run" condominium project located in Alpine County. In January 1983, plaintiffs obtained a $1.8 million construction loan from Canadian Commercial Bank. During this transaction, a document entitled "Cancellation of Lease" was executed. Neither the lender's nor the borrowers' instructions explicitly ordered a cancellation of the lease. The cancellation was acknowledged on January 28, 1983, but not recorded until March 30, 1983. Escrow closed January 31, 1983. At trial, plaintiffs alleged that defendants fraudulently created the Cancellation of Lease in mid-March; that it was falsely notarized; that there were no escrow instructions to cancel the lease and that, as a result of the recording of the cancellation document, they were unable to use the lease to obtain additional project financing. After plaintiffs rested their case, the trial court granted defendants' motion for judgment. (Code Civ. Proc. § 631.8.)

Plaintiffs now contend that defendant, First American Title Company (First American) breached its fiduciary duty by failing to draft an assignment and subordination of the lease as instructed by both borrowers and lender and by recording the cancellation of the lease without the consent of all of its partners. They argue that defendant Maggie Foxworthy breached her obligation as a notary by notarizing without witnessing the signatures, by altering documents when she changed jurats without the consent of the parties and by failing to keep proper notarial records. They further argue that the trial court incorrectly stated the facts presented at trial and that it erred in failing to exclude defendants' counsel for conflict of interest.

We affirm. We find that the final instructions did not require an assignment and subordination of the lease but that it be removed from title. Defendants did not breach their fiduciary duty in preparing the cancellation. Preparation and execution of the cancellation were reasonably implied from both lender's and borrowers' instructions and from defendants' implied promise as escrow holder to perform all acts necessary to and not

expressly excluded by the instructions. We further find that the lessor at the time of the cancellation was the Kirk Corporation. Although the cancellation was arguably defective, there was substantial evidence to support the trial court's conclusion that the signatures of plaintiffs Patrick Brown and Robert Noland, taken in the context of the loan transaction, constituted the necessary authorization to record the cancellation. Accordingly, defendants did not breach their fiduciary duty or act negligently by notarizing and recording the cancellation.

### FACTUAL AND PROCEDURAL BACKGROUND

To understand the facts at issue, an identification of the principal individuals and business entities involved is in order: Plaintiffs are a Nevada general partnership, misnamed the Kirk Corporation, and its four (then) general partners, Patrick Brown, Robert Noland, Clyde Henderson and Marlina Henderson. Patrick Brown was the lessee. There was a dispute as to whether the lessor was Robert Noland or the Kirk Corporation. The cancellation was signed by Noland and Brown. Defendant First American was the escrow agent for this loan and issued title insurance. Defendants James Peek, Christopher Rush and Maggie Foxworthy were employed by First American during the transaction. Maggie Foxworthy, a notary public, was the escrow officer and notarized the documents signed to close escrow. Chris Rush was the title officer for the escrow. James Peek was the county manager who assisted in the preparation of the cancellation document.

On February 4, 1985, plaintiffs filed a complaint for damages against First American and James Peek, Richard Thomas, Maggie Foxworthy, individually and as agents and employees of First American, alleging breach of contract, breach of fiduciary relationship and breach of notary public bond. Thomas was subsequently dismissed and Chris Rush added as a defendant. In the first cause of action, plaintiffs alleged that the Cancellation of Lease was prepared without the knowledge or consent of Brown or Noland. Plaintiffs alleged that their signatures were obtained by fraud or trickery when the document was inserted in other documents executed by them on March 15, 1983. The resultant forged Cancellation of Lease was then recorded on March 30, 1983.[1] Plaintiffs later attempted to utilize the lease for further financing but were denied loans due to the recorded Cancellation of Lease. In its second cause of action plaintiffs alleged that Maggie Foxworthy breached her obligation as a notary by falsely swearing that she personally witnessed Brown and Noland sign the Cancellation of Lease which defendants manufactured in violation of their fiduciary duties and

---

[1] Plaintiffs originally alleged that the signatures of Brown and Noland were forged. By oral amendment, they conceded that the signatures were genuine, but were obtained by deception.

their implied covenant of good faith and fair dealing. In its third cause of action, plaintiffs alleged that Foxworthy negligently performed her functions as a notary and that the remaining defendants negligently discharged their duties to plaintiffs in connection with this escrow. A total of $49 million in damages was requested.

### Creation of the Brown Lease

On February 7, 1978, Patrick and Lucy Zicovich Brown acquired lot 11 of Kirkwood Meadows Alpine Unit No. 1 from the Brunzell Corporation, for a purchase price of $360,000. The property is located in the Kirkwood ski area of Alpine County. The Browns made a $60,000 down payment. A promissory note of $300,000, payable on February 17, 1983, was given and was secured by a deed of trust on lot 11.

On May 31, 1979, the Browns conveyed Lot 11 to Kirkwood Towers, a joint venture consisting of Patrick Brown, Robert Boles and M.C.S. Properties (MCS), a general partnership, for $600,000. The joint venture paid Brown $300,000 and assumed the $300,000 Brunzell note. It began construction on the building and completed four of the eight stories by the spring of 1981.

On March 5, 1981, Kirkwood Towers conveyed Lot 11 to the partnership of Noland and Brown. The partnership bought Boles's interest in both joint ventures for a $400,000 note and MCS's interest for a $960,000 note. That same day, Noland and Brown conveyed Lot 11 to Noland and Brown, a partnership, and Texas Energy Investment Corporation (Texas Energy). In June 1981, Texas Energy provided a $1.7 million loan to finance the buy out of Boles's and MCS's interests, secured by a $1.7 million deed of trust on both properties. On June 11, 1981, Brown, Noland and Texas Energy conveyed title to a newly created company, Tahoe Ski Resorts, Inc., in which they were all shareholders.

On November 1, 1981, Tahoe Ski Resorts gave Brown a lease for a bar and restaurant unit to be built at the Kirkwood Towers Project and an 80-acre parcel of land known as the River Ranch Property in Nevada in exchange for all his stock. The lease, which was recorded on September 10, 1982, provided for a term of 30 years commencing on the date of its completion. At the expiration of the full term, Brown was to receive the fee to the unit without paying any additional consideration. If the lessor failed to develop a time-share project on the premises, Brown was to receive the fee after five years, again without paying any additional consideration. The lease allowed for the assignment, sale or transfer of respective interests by both lessor and lessee. It provided that the lessee "shall attorn to any

successor in interest of Lessor; and this Lease shall remain in full force and effect subsequent to any transfer of the interest of Lessor or Lessee . . . ." The lease also provided that "[a]ny interim or permanent financing to fund construction and finishing of the Kirkwood Towers project to be located on the Project Premises, including all common areas and the restaurant facility, shall be subordinated to Lessee's leasehold interest pursuant to this Lease."

### Creation of Kirk Corporation

On September 14, 1982, Tahoe Ski Resorts conveyed all of its interest in Lot 11, including the lease, to Noland for $850,000. To finance the sale, Noland (1) obtained a $300,000 short-term loan from California Housing Securities, Inc., which required a $90,000 loan fee. A deed of trust on Lot 11 was given to it to secure Noland's note for $390,000, which was due November 15, 1982; (2) gave Tahoe Ski Resorts a $250,000 note and deed of trust, due in six months; and (3) assumed the $300,000 Brunzell note (due February 3, 1983), secured by a deed of trust on the property. At the same time, Tahoe Ski Resorts assigned its interest as lessor of the Brown lease to Noland. The assignment, dated September 1982, was not acknowledged.

On September 14, 1982, Noland recorded a grant deed conveying his interest in Lot 11 as follows: 80 percent to himself; 10 percent to Brown and 10 percent to the Hendersons. On September 22, 1982, Noland, Brown, Clyde Henderson and Marlina Henderson entered into a partnership agreement to create the Kirk Corporation. Under its terms, profits were to be distributed 50 percent to Noland, 25 percent to Brown and 25 percent to the Hendersons. Under the terms of the partnership agreement, the consent of each of the partners was required for certain decisions.

On January 28, 1983, Noland, Brown and the Hendersons conveyed all of their interest in Lot 11 to the Kirk Corporation. The deed was recorded January 31, 1983.

### Canadian Commercial Bank Construction Loan

A. *Escrow Instructions*

To complete construction on the project and to pay off the various notes which were shortly coming due, plaintiffs began seeking a construction loan. On January 17, 1983, Canadian Commercial Bank (CCB) wrote plaintiffs two letters by which it gave them a commitment for a $1.8 million construction loan to be secured by a $1.8 million first deed of trust on the Kirkwood Towers. In its first commitment letter, CCB vice-president Ken-

nedy indicated that one of the terms of the loan was that the "lease between Tahoe Ski Resorts, Inc. and Patrick Brown will be approved by and assigned to the Bank." In addition, the Brunzell debt was to be subordinated to the bank debt. In its second letter, Kennedy added the additional condition that the "lease between Tahoe Ski Resorts, Inc., a Nevada Corporation and Patrick W. Brown will be subordinated to the Bank's Deed of Trust."

The CCB loan was due on October 26, 1983. A tri-party agreement, by which a long-term or "take out" lender agreed to replace CCB's construction loan after completion of the construction, was required as a condition of the loan. The take-out lender required that escrow close on January 31. Timely closure was essential to preserve this commitment. The CCB loan proceeds were ultimately distributed to pay off the Tahoe Ski Resorts note ($250,000); the California Housing Securities note ($390,000) and to make a partial payment of $40,000 on the Brunzell note, which had a balance of $260,000. The remaining $719,950 was believed to be sufficient to complete construction.

In a January 21, 1983, letter to Noland, Kennedy forwarded to plaintiffs "a draft set of documents for our recently committed (*sic*) $1.8 million loan." Kennedy advised plaintiffs that the bank had not yet reviewed these documents. The undated draft escrow instruction letter to Argonaut Title Company (which later merged with First American Title) advised defendant of the bank's loan to plaintiff and enclosed various documents in connection with the loan. Included in these documents were an original and one copy of "Assignment of Lessor's Interest in Lease" and an original and one copy each of "two Subordination Agreements," which defendant was directed to have executed. Defendants testified that they never received this draft letter.

On January 24, 1983, CCB's attorneys sent escrow instructions to Argonaut/First American regarding the Kirk Construction Loan. Receipt of this letter was acknowledged by Maggie Foxworthy on January 28, 1983. The letter made no reference to an "assignment of lessor's interest in lease" document and enclosed only one subordination agreement. The letter advised defendants that "[*t*]his escrow is not to close until you receive final instructions from Mr. Kennedy." After receiving final instructions from Kennedy, defendant was authorized to disburse the loan and "record the Subordination Agreement and the Deed of Trust when but only when: 1. First American Title Insurance Company is in a position to issue to Bank its American Land Title Association Policy, Additional Coverage — 1970 LP-10 Package policy of title insurance, in the amount of $1,800,000, insuring the above Deed of Trust as a first lien upon the real property described therein with fee title thereto vested in the Borrower, subject only to current

taxes and assessments not yet due or payable and exceptions 4, 5, 6, 7, 8 and 9 of your Commitment No. 43066, dated September 14, 1982. In addition, you shall also be prepared to issue CLTA Endorsement Nos. 100, 102.5, 104.6, 116 and 122 at the appropriate times." The letter also indicated that, at or before closing, the "Bank will deliver to you the sum of $ _____ as the initial loan disbursement, . . ." This amount, $772,113.56, was filled in by hand.

The CLTA endorsement standard form No. 104.6 referred to in this letter insures against loss sustained as a result of any defects in execution of "the document entitled Collateral Assignment of Leases and Rents, . . . and [¶] the existence, as shown by the public records, of any prior assignment of the lessor's interest in the lease or leases specified in such document, . . ."

The September 14, 1982, Title Insurance Policy, commitment No. 43066, referred to in the instructions contained 14 exceptions. Exception No. 10 referred to the 30-year lease "date November 1, 1981, executed by and between the parties named herein, . . . recorded September 10, 1982. Lessor: Tahoe Ski Resorts, Inc. . . . Lessee: Patrick W. Brown." The exclusion of No. 10 indicated that CCB was not willing to have its title subject to the lease. An earlier version of the policy, which did not contain the commitment number referred to in the instruction letter, listed only 11 exceptions and showed the Brown lease as No. 8.

The borrower's escrow instructions were prepared by Foxworthy on January 28, 1983. These instructions were prepared from the lender's instructions, with one exception. The borrowers' instructions listed acceptable exceptions to title as numbers 4, 5, 6, 7, 8, 9, 12 with "Item 12 to be subordinated to second lien priority position (Brunzell)" as shown in First American's preliminary title report dated January 18, 1983. By referring to a more recent title report, the borrowers' instructions were not technically in conformance with the lender's instructions. A comparison of the January 1983 report indicated that the numbered exceptions were the same as in the September 1982 insurance policy. In both documents, the Brown lease was exception No. 10 and was not included as an acceptable exception. Foxworthy admitted that according to the lender's instructions, she should have referred to the September policy, unless an updated preliminary title report had been issued. The key was the particular items that appear as a condition of a title, not the date of the report.

The tri-party agreement signed by plaintiffs on January 28th also indicated that the take-out lender would accept fee title subject only to the same exceptions contained in the Lender's instructions, not including the Brown

lease. There was no mention of subordinating the lease. Noland testified that he read and signed this agreement.

Brown testified that he never checked the title commitment referred to in the instructions to verify the items to which it was referring. Brown also testified that he had read and signed the borrowers' escrow instructions, noting that they explicitly referred to the subordination of the Brunzell deed of trust and did not mention a subordination of his lease.

As a title officer, Rush testified that the reference to a more recent report in the borrowers' instructions was consistent with the lender's instructions and that, because the exceptions were the same, the difference in the commitment dates was insignificant. Compliance with both borrowers' and lender's instructions required that they eliminate the lease. This could be accomplished either by cancellation or quitclaim.

Foxworthy testified that she filled in the dollar figure in the lender's escrow instructions. There were two versions of the letter. In the January 28 version she fixed the amount at $772,113.56. A January 31 version, which was not included in the record, indicated the amount of $771,852.16, which Foxworthy filled in and initialled. A circle was drawn around the September 14, 1982, date and a line was drawn through the endorsement 104.6. Foxworthy testified that she did not recall if she made these marks, but that the letter was unmarked when she received it. She did not explicitly recall discussing the 104.6 endorsement with CCB, but said that there were numerous phone calls during this transaction.

Rush testified that he did not authorize or instruct in the preparation of the cancellation of lease. Foxworthy asked him whether he wanted a quitclaim deed or a cancellation of lease to remove it from title, and he told her he would rather see a cancellation. She did not ask him about subordination which would not remove the lease from title. Rush did not consider subordination as an alternative.

Harold Labrie, plaintiffs' title and escrow expert, testified that the lender's instructions were not as complete as they should have been. He agreed that the exceptions in the two title commitments referred to in the lender's and borrowers' instructions were substantially the same. He testified that frequently lender's instructions will instruct the title company as to the desired result without specifying the means to achieve it. He understood the bank's instructions as requiring the elimination or subordination of the loan. Because subordination was specifically requested as to the Brunzell deed of trust, it was fair to assume that this was not an option for the lease. He would expect the lender to generally instruct the title company which

would then undertake the steps necessary to comply. The borrowers would have to comply with the lender's instructions if they wanted the loan and their instructions are "to write the policy that the lender requires." Labrie testified that specific acts are sometimes implied from general escrow instructions. He also stated that, in such cases, the title company has the responsibility to advise the borrower of what must be done to meet the lender's instructions. The consent of the borrower is normally verbal and not evidenced in the escrows. Industry standards drop, especially when there is a rushed escrow. He considered this to be poor practice.

Labrie agreed that of all the 30 documents signed on January 28, the cancellation was the shortest and its intent most clear.[2] His experience was that escrow officers who are also notaries will frequently attach acknowledgments after the parties have signed and left. When unclear instructions are received, the escrow holder should request clarification from the principals. Labrie testified that, in this case, he would not call the escrow instructions deficient or unclear. He thought that the title company could have responded to them, even though cancellation was not mentioned. Good practice, however, would require written instructions. He concluded that, based on the instructions and the signatures of both Brown and Noland, Foxworthy could reasonably assume that she had the necessary instruction to record the cancellation.

B. *Preparation and Execution of Cancellation of Lease*

In response to the lender's instruction, Foxworthy prepared a cancellation of lease to remove it from title. She was unsure how to prepare it so she asked Jim Peek, defendant's assistant county manager, for assistance. Peek told her she could release a lien from the property records by either quitclaim or cancellation of lease. He then told her the wording to use to prepare the cancellation while she typed it out.

Peek testified he had a conversation with Henderson approximately two days before Foxworthy asked him if she should prepare a cancellation or a quitclaim. Henderson asked him, "how do you get rid of a Lease?" Peek told Henderson to do it either by quitclaim or by cancellation.

On January 28, 1983, Noland, Brown, and the Hendersons appeared before Foxworthy to sign approximately 30 documents which constituted

---

[2] In its entirety, the cancellation provided: "CANCELLATION OF LEASE Robert C. Noland and Patrick Brown hereby agree that certain lease dated November 1, 1981, executed by and between Tahoe Ski Resorts, Inc., a Nevada Corporation as Lessor and Patrick W. Brown, as lessee, recorded September 10, 1982, in Book 42 of official records at page 83 of office of the County Recorder of Alpine County, State of California, is hereby CANCELLED."

the whole loan package. She testified that the partners were all seated in front of her desk and that, in her usual manner, she presented the documents to them one at a time, describing what each document was. She handed each document to one partner and it was passed around the desk to be signed. She recalled mentioning the cancellation of lease, handing it over and seeing it signed by Brown and Noland.

Noland testified that he had never signed the cancellation of lease; that he did not sign any documents on January 28 which had not been signed by all four partners and that Foxworthy never mentioned the cancellation of lease while they were signing the loan package.

Brown testified that he never gave defendants any oral or written instructions to prepare or record a cancellation of lease; that CCB never asked him to cancel his lease; that defendants never told him they were going to cancel his lease. Although he admitted that his signature was in fact on the cancellation, he did not recall ever signing such a document. He did not discover its existence until early February 1984 when he was examining a title report and saw that the lease was not mentioned. He then went to the recorder's office and discovered the cancellation of lease. The recorded cancellation indicated that it had been returned to the Hendersons' address. The Hendersons originally denied that they had received it. In the spring of 1984, the Hendersons told Brown that they had found the recorded cancellation unopened in a box in their office. Brown then called his attorney, who wrote defendant. Brown later had a meeting with several individuals at First American. In June 1984, Noland and Brown executed a "Reaffirmation of Lease," which was recorded June 26, 1984.

Testimony indicated that the partners were aware of the importance of timely execution of the Brunzell subordination and that Henderson had made a special trip to have Brunzell sign the document in time for closing. The Hendersons did not testify.

Carlton Kinney testified that after the documents were signed, Foxworthy did not make or give out any copies of the executed documents. Instead, she gave him the package of documents which he transported to the Alpine County Recorder's office. The county recorder gave him a written receipt with the time and date and put the documents into the vault. Foxworthy testified that she made two sets of copies of the executed documents. She gave one copy to the Hendersons and mailed the other to Rush. She gave the envelope with the original documents to Clyde Henderson to deliver to the Alpine County Recorder.

The county recorder testified that they did not use receipts such as those described by Kinney.

## C. *Notarization of Cancellation of Lease*

On its face as recorded, the "Cancellation of Lease" was signed by Noland and Brown in their individual capacities. The attached notarial jurat indicated that these plaintiffs had personally appeared and signed the documents before Foxworthy on January 28, 1983. The cancellation itself was undated. Testimony revealed that three jurats dated January 28, 1983, were actually prepared. A four-person partnership jurat was originally attached by tape to the cancellation of lease by Foxworthy. When this error was discovered by Chris Rush, a corrected two-person individual acknowledgment by Foxworthy was prepared and the names of Brown and Noland were typed in vertically. It was then stapled to the document and recorded. Foxworthy testified that she later prepared a third two-person individual jurat in which the names of Noland and Brown were horizontally typed. This was done to give CCB a copy because she had not received a confirmed copy from the recorder's office.

Foxworthy testified that while working for defendant she kept a notary journal and that this activity was unsupervised. The signatures of Brown, Noland or the Hendersons did not appear in her public notary journal prior to March 30. She did not have any of the partners sign her notary book on January 28 because she already knew them. Although she admitted that it was a technical requirement to have everybody sign the book, it was the practice not to have them sign if she knew them already. She admitted that this practice violated her notary requirements.

## D. *Recording of Cancellation of Lease*

Because the undated cancellation was not recorded until March 30, 1983, it was essential to plaintiffs' theory to demonstrate that the document did not exist until March 15 when the partners allegedly executed a "Cancellation of First Amended Partnership Agreement" before Foxworthy.

Maggie Foxworthy testified that the cancellation of lease was among the package of documents which she sent to the recorder on January 28. An improper four-person jurat was attached to it when it left her office and she never saw the document again. She prepared the two-person acknowledgment and gave it to someone to attach to the cancellation. Neither Brown nor Noland was present at that time.

A First American internal order form from Foxworthy to Rush, dated January 28, indicated that the cancellation of lease was among those documents forwarded to Rush. A memo from Foxworthy to Doranna

Tognotti, defendant's recorder, requested that Tognotti hold the documents until released for recording by Chris Rush.

Chris Rush testified that he originally received a copy of the cancellation which had a four-person instead of a two-person acknowledgment taped to it. He called and explained to Foxworthy that it could not be recorded due to the improper jurat. A corrected two-person acknowledgment was prepared and stapled to the cancellation. He never saw the original four-person jurat after it was removed.

Prior to recording the cancellation of lease, it was necessary to record a duplicate original of the September 14, 1982, assignment of lease from Tahoe Ski Resorts to Noland. Noland executed the duplicate on February 7, 1983. The assignment referred to the lease as exhibit A. On February 16, Rush gave the assignment of lease, the cancellation of lease with the corrected two person jurat and a reconveyance of deed of trust to Doranna Tognotti to record. A copy of the lease, exhibit A to the assignment, was not provided. Tognotti called him from the recorder's office and told him that the cancellation of the lease had to be "unrecorded" due to the missing exhibit.

Tognotti testified that she took these documents to the recorder's office which was in the process of recording them when the absence of exhibit A was discovered. The recording data which had been placed on the documents was obliterated and they were returned. In a February 16 memo, Tognotti returned the "unrecorded" documents to Rush.

Rush received a copy of the lease to attach as exhibit A by February 18, 1983, but failed to record the documents until March 30, 1983, because he was busy.

A document examiner expert witness testified that a date entry of February 16, 1983, appeared under the ink obliteration marks on the cancellation. Time, volume and fee information was also revealed. Similar sequential time, volume and page numbers appeared on the assignment of lease, which was undated.

E. *CCB Amendment to Authorized Credit*

In an April 21, 1983, internal memo to the vice-president, credit, CCB's Kennedy requested an "Amendment to Authorized Credit" on the Kirk loan, specifically changing "the authorization requirement as delineated in the application for credit dated January 12, 1983, and the Confirmation of Credit dated January 17" to remove the subordination and assignment of

lease requirements. The letter stated "Since Patrick Brown, the lessee, is now an owner, the lease was terminated. The above items were to be required if the lease was to remain in effect. . . . Since the lease was terminated and subsequently removed from the title, the subordination was no longer necessary."

### Creation of SMW Joint Venture

On March 16, 1983, Kirk Corporation entered into a joint venture agreement with SMW Construction Corporation (SMW) for the purpose of completing the Kirkwood condominium project. SMW was comprised of Striffler, Millman and Weinsten. At the time of this agreement, the project was encumbered by a first deed of trust securing CCB's $1.8 million construction loan and a second deed of trust of $260,000 securing the Brunzell note which was in default. Under the agreement, Kirk Corporation sold SMW an undivided 50 percent interest in the property and the project for SMW's contribution of $500,000 in cash. This contribution was used to pay off the Brunzell second deed of trust. The joint venture agreement contained a seller's representation that Noland was its managing partner with full power to negotiate and consummate the agreement and to conduct future business on behalf of Kirk Corporation and all of its partners. The agreement also stated that its purpose was to complete the construction and marketing of the projects, to maintain title to the bar and restaurant premises and to lease the bar and restaurant to a "separate entity." The agreement made no mention of the Brown lease. All four Kirk partners signed the joint venture agreement. Pursuant to this agreement, Noland then signed a memorandum of agreement with SMW on behalf of Kirk Corporation, referencing the sale, which was recorded on March 16, 1983. A grant deed from Kirk Corporation to Kirk Corporation and SMW was recorded on February 1, 1984.

On March 16, 1983, Brown and Noland, individually, entered into the "Kirkwood Towers Restaurant and Bar Agreement" with SMW. Under this agreement, Brown and Noland sold SMW an undivided one-third interest in "Seller's lease rights," including the liquor license. The recitals contained in the agreement provided that Kirk Corporation was the fee owner of unit two of Kirkwood Towers, in which the restaurant and bar were located and that Brown and Noland had "present lease rights" from Kirk for the purpose of operating the restaurant and bar. Brown testified that he recalled signing this document on March 15 at First American because it was the only document which all of the partners did not sign.

### Cancellation of First Amended Partnership Agreement

Noland testified that the original Kirk Corporation partnership agreement was amended at the request of SMW. In order to consummate their

joint venture agreement, all Kirk partners signed the first amended partnership agreement before Maggie Foxworthy on March 9, 1983. The effect of the amendment was to alter the original agreement's unanimity provision by giving Noland sole authority to negotiate and to commit the partnership. Testimony was given that, because the Hendersons did not want Noland to have this much authority, they decided to cancel this amendment almost as soon as the ink was dry.

Plaintiffs offered evidence that defendants had obtained their signatures on the cancellation of lease by trickery on March 15, 1983, when they allegedly appeared before Foxworthy to sign the cancellation of first amended partnership agreement. Brown theorized that the lower, signature portion of the cancellation of lease had been somehow affixed to the top half of the cancellation of first amended partnership agreement which had been folded just below the signature lines for partners Clyde and Marlina Henderson.

The cancellation of first amended partnership agreement, which was not recorded, appeared to be a forgery because the upper portion was distinctly darker than the lower portion containing Brown's and Noland's signatures. In addition, the upper portion of the document was dated March 15, while the bottom contained a four-person general partnership jurat by Maggie Foxworthy dated January 28, 1983. The expert document examiner testified that this document was not authentic but was a "paste-up" combining its upper portion with the cancellation of lease. He also testified that the four-person jurat on the bottom of the document was the same as that originally taped to the cancellation of lease on January 28.

In addition, the cancellation of first amended partnership agreement appeared unnecessary. A second amended partnership agreement was signed by all Kirk partners on March 16, the day after the close of the SMW escrow. This second amended partnership agreement had the identical effect as the cancellation of the first amended partnership agreement; that is, it returned the unanimity provisions of the original partnership agreement. Noland agreed "that two days after you (Kirk partners) signed one document to accomplish that purpose, you went to another title company and signed still another." Brown testified that the Hendersons found this document in the spring of 1985, in the same box of records where they found the cancellation of lease after searching through it a year earlier. A verified complaint filed by Brown and the Hendersons against SMW, Bank of Hapoalim and Noland in December 1984 described the authority of the partners referred to in both the first and the second amended partnership agreements, but made no reference to the cancellation of the first amended

partnership agreement. Brown denied manufacturing this document with the Hendersons.

### Financial Collapse of the Project

SMW did a poor job of attempting to complete the project and incurred significant cost overruns. Tensions arose between Brown and SMW. On August 16, 1983, Brown sold out his interest in the Kirk/SMW joint venture in return for acquiring Noland's one-third interest in the bar and restaurant.

In December 1983, to obtain the additional funds necessary to complete the project, Kirk and SMW entered into a $850,000 loan transaction with the Bank Hapoalim. Only $350,000 was actually loaned but the $850,000 deed of trust included $500,000 previously loaned to SMW by the bank which SMW had used to buy into the joint venture. This loan was due February 1984.

On February 1, 1984, Kirk and SMW refinanced the CCB loan which was then overdue, with another short-term $1.8 million loan from Saratoga Savings and Loan (Saratoga). CCB was paid off and Saratoga was given a blanket deed of trust on the entire project, including the Brown leasehold. This loan was due in July 1985.

Notices of default were subsequently filed by Saratoga on the $1.8 million loan on May 16, 1984, and by the Bank of Hapoalim on its $850,000 loan on July 5, 1984.

A final refinancing attempt was made to forestall foreclosure. Sears Savings Bank made loans exceeding $200,000 to alleged purchasers of each of 10 units in the projects. The loan was based on fraudulent representations by SMW that down payments had been made on these 10 units. The Sears loan proceeds were used to pay the Saratoga loan down to a balance of $300,000.

SMW and Kirk Corporation thereafter filed bankruptcy proceedings. Various lawsuits ensued.

### Summary Judgment Motion

On August 22, 1986, Defendants filed a motion for summary judgment or summary adjudication of issues, which was denied. Defendants requested reconsideration. On June 3, 1987, the court issued its tentative decision. The court discussed various disputed and undisputed facts. It determined that

there was no dispute that the cancellation was defective; however, that it was of no legal effect did not mean that the recording of the cancellation did not have adverse economic consequences for the plaintiffs. It was also determined that at the time the cause of action arose in March 1983, the ownership interest of the restaurant premises was in the Kirk Corporation and the leasehold interest was in Noland as lessor.

### Motion to Disqualify Counsel

On March 27, 1987, the court heard plaintiffs' motion to disqualify defense counsel Regalia on the grounds that the firm in which he was a partner several years previously had prepared a declaration of covenants, conditions and restrictions (CC&R's) for Whiskey Run while representing Kirk Corporation. In his declaration in support of this motion, Brown stated only that "at such time, and periodically thereafter, declarant and his associates provided confidential information to said law firm" in connection with the preparation of the CC&R's. In opposition, defendants submitted a page from Brown's deposition in which he testified that SMW's Striffler handled the CC&R's and that he had had no participation with their preparation. Defense counsel Regalia declared that he began representing defendants in this matter in early 1987. He had not personally represented Kirk or any of its principals and none of the other firm members had ever heard of or represented Kirk. His investigation revealed that in 1983, former associate Giselle Jurkanin had worked on the file preparing CC&R's for "Whiskey Run." Regalia discussed this with the partner with whom Jurkanin worked. The partner had no recollection of the representation. He was informed that Jurkanin took the file with her when she left the firm in early 1984. The court denied the motion, stating that plaintiffs "have utterly failed to demonstrate that Ms. Jurkanin's work had any even remote connection with the legal or factual issues of the present litigation or that Mr. Regalia's firm acquired any confidential information relating to the issues presently before the Court. Consequently, plaintiffs cannot meet the threshold burden of demonstrating that defense counsel's former representation is 'substantially related' to the current representation."

### Trial

A nonjury trial began September 8th and concluded October 6, 1987. On September 9, the court granted defendants' motions to exclude evidence of damages until liability had been determined. After the close of plaintiffs' case, defendants moved for judgment in their favor pursuant to Code of Civil Procedure section 631.8. After argument, the court concluded that plaintiffs had not met their burden of proof. In its 10-page statement of decision, the court concluded that, although plaintiffs pleaded three causes

of action (fraud/conspiracy, breach of the covenant of good faith and fair dealing, and escrow negligence), "the basic thrust of the plaintiffs' case against the defendants is the same in all such causes of action: that defendants wrongfully caused to be recorded a document entitled 'Cancellation of Lease,' whereby the BROWN Lease was eliminated or its legal effect clouded such as to preclude the use of the leasehold as security for loans which allegedly would have been obtained to finance the completion of the Kirkwood Towers project. Thus, the plaintiffs' position depends upon establishing that BROWN and NOLAND did not execute the Cancellation of Lease on January 28, 1983, in connection with the escrow closing of the Canadian Commercial Bank loan described above. [¶] . . . The Court finds that the testimony of MAGGIE FOXWORTHY, the escrow officer and employee of FIRST AMERICAN who handled the escrow, is credible. She identified to BROWN and NOLAND the Cancellation of Lease document and they did execute the Cancellation of Lease on January 28, 1983, as she testified. The signatures of BROWN and NOLAND on the Cancellation of Lease document constituted authorization for FIRST AMERICAN to record that document, without further written instructions, when taken in conjunction with the other documents such as the Bank's escrow instructions. These support the conclusion that the Canadian Commercial Bank loan could not be closed and funded except on condition that the Cancellation of Lease document or a quitclaim deed be recorded, in order to cancel the lease of record." Accordingly, the court determined that defendants had no liability and that judgment should be entered in their favor.

## STANDARD OF REVIEW

Under Code of Civil Procedure section 631.8, "(a) After a party has completed his presentation of evidence in a trial by the court, the other party, without waiving his right to offer evidence in support of his defense or in rebuttal in the event the motion is not granted, may move for a judgment. The court as trier of the facts shall weigh the evidence and may render a judgment in favor of the moving party, in which case the court shall make a statement of decision as provided in Sections 632 and 634, or may decline to render any judgment until the close of all the evidence. The court may consider all evidence received, provided, however, that the party against whom the motion for judgment has been made shall have had an opportunity to present additional evidence to rebut evidence received during the presentation of evidence deemed by the presenting party to have been adverse to him, and to rehabilitate the testimony of a witness whose credibility has been attacked by the moving party. . . . [¶] (c) If the motion is granted, unless the court in its order for judgment otherwise specifies, such judgment operates as an adjudication upon the merits."

■ The purpose of a motion for judgment is to allow the trial court to dispense with the need for a defendant to produce evidence when, after weighing the evidence at the close of the plaintiff's case, it is persuaded that the plaintiff has failed to sustain its burden of proof. (*Heap* v. *General Motors Corp.* (1977) 66 Cal.App.3d 824, 829 [136 Cal.Rptr. 304].) In weighing the evidence on a motion for judgment at the close of the plaintiff's case, the trial court may exercise its prerogatives as a fact finder by refusing to believe witnesses and by drawing conclusions at odds with expert opinion. (*Miller* v. *Dussault* (1972) 26 Cal.App.3d 311, 316 [103 Cal.Rptr. 147]; *Greening* v. *General Air-Conditioning Corp.* (1965) 233 Cal.App.2d 545, 550 [43 Cal.Rptr. 662].)

■ In reviewing a judgment granted in favor of defendant after the plaintiff has completed its presentation of evidence in a court trial, the evidence is viewed most favorably to the defendant and the judgment must be supported by substantial evidence. (*Robert H. Jacobs, Inc.* v. *Westoaks Realtors, Inc.* (1984) 159 Cal.App.3d 637, 642 [205 Cal.Rptr. 620].) The function of the reviewing court is to determine whether the judgment is supported by any competent and substantial evidence. (*Rodde* v. *Continental Ins. Companies* (1979) 89 Cal.App.3d 420, 424 [152 Cal.Rptr. 500]; *Swanson* v. *Skiff* (1979) 92 Cal.App.3d 805 [155 Cal.Rptr. 280].) The trial court's findings in granting a motion for judgment are entitled to the same respect on appeal as any other findings and are not reversible if supported by substantial evidence. (*U.S. Industries, Inc.* v. *Vadnais* (1969) 270 Cal.App.2d 520 [76 Cal.Rptr. 44].) When two or more inferences can be reasonably deduced from the evidence, the reviewing court is without power to substitute its deduction for those of the trial court. (*Trigg* v. *Smith* (1966) 246 Cal.App.2d 510, 515 [54 Cal.Rptr. 858].)

BREACH OF FIDUCIARY DUTY

■ "An escrow holder bears a fiduciary relationship to each party [citations]; he must comply strictly with the instructions of the principals; if he disburses the property of his principals in violation of his instructions or otherwise breaches that duty, he is liable to the injured parties for breach of contract. [Citations.] Similarly, it is the duty of the escrow holder to exercise ordinary skill and diligence in his employment and if he acts negligently, he is liable for any loss proximately occasioned by such negligence. (*Amen* v. *Merced County Title Co., supra* [1962], 58 Cal.2d 528, 532 [25 Cal.Rptr. 65, 375 P.2d 33]; *Rianda* v. *San Benito Title Guar. Co.* [1950] 35 Cal.2d 170, 173 [217 P.2d 25]; *Banville* v. *Schmidt* [1974] 37 Cal.App.3d 92, 106 [112 Cal.Rptr. 126]; *Spaziani* v. *Millar, supra* [1963], 215 Cal.App.2d

667, 682-683 [30 Cal.Rptr. 658].)" (*Common Wealth Ins. Systems, Inc.* v. *Kersten* (1974) 40 Cal.App.3d 1014, 1030-1031 [115 Cal.Rptr. 653].) Defendants concede that they had a fiduciary duty to Kirk Corporation in relation to the CCB escrow.

■ An escrow holder has an implied obligation to do all of the things normally done by an escrow agent which were not expressly excluded by the escrow instructions. (*Bruckman* v. *Parliament Escrow Corp.* (1987) 190 Cal.App.3d 1051, 1056 [235 Cal.Rptr. 813].) Upon the escrow holder's breach of an instruction that it has contracted to perform or of an implied promise arising out of the agreement with either party, the injured party acquires a cause of action for breach of contract. (*Rianda* v. *San Benito Title Guar. Co.* (1950) 35 Cal.2d 170, 173 [217 P.2d 25]; *Claussen* v. *First American Title Guaranty Co.* (1986) 186 Cal.App.3d 429, 435 [230 Cal.Rptr. 749].) As noted in *Claussen, supra*, at page 436, "escrow instructions may be oral, even when some are in writing [citations] and [] some escrow instructions may be implicit in the express instructions given. (*Gordon* v. *D & G Escrow Corp.* (1975) 48 Cal.App.3d 616, 621-623 [122 Cal.Rptr. 150]—escrow instructions implicitly required proceeds of sale to be paid to both sellers.) In the event of a conflict or apparent error in instructions, the escrow holder is obliged to take corrective steps before obeying questionable instructions. (*Diaz* v. *United California Bank* (1977) 71 Cal.App.3d 161, 167, 171 [139 Cal.Rptr. 314]; *Kirby* v. *Palos Verdes Escrow Co.* (1986) 183 Cal.App.3d 57, 65-66 [227 Cal.Rptr. 785].)"

*Assignment and Subordination of Lease*

■ Plaintiffs argue that defendants had a fiduciary duty to draft and record an assignment and subordination of lease as "agreed" by plaintiffs and CCB in CCB's letter of January 17, 1983. Plaintiffs allege that this letter was delivered to Foxworthy by Brown and Noland on January 21. Essentially, plaintiffs' argument is that because the final instructions conflicted with the draft instructions, defendants had a duty to investigate.

Plaintiffs' position is not supported by the record. The instructions on which they rely to impose a duty to prepare and record an assignment and subordination of lease were clearly stamped DRAFT. Plaintiffs were advised that the bank's attorneys had not yet reviewed them. A review of First American's escrow file produced no physical evidence that it had ever received a copy of this letter. Foxworthy testified that she never received this letter. The court made a finding supporting her credibility. There was therefore no confusion or conflict with previous instructions which would impose a duty to investigate or to take corrective steps on defendants.

In addition, the conduct of the plaintiffs themselves indicated that they were aware that there was no instruction by the lender to subordinate the lease. This conclusion is supported by substantial testimony regarding the subordination of the Brunzell deed of trust. Although a single, undesignated subordination agreement was referred to in the lender's instructions, the Brunzell subordination was explicitly mentioned in the Borrowers' instructions. There was testimony from Brown and Noland regarding their concern over the Brunzell subordination, which had to be signed twice. That a similar preoccupation over the execution of a subordination of the lease was not manifest indicates that the parties had no expectation that such a document would be executed. In addition, the tri-party agreement referred to in the lender's instructions made no exception for the lease. Plaintiffs read and signed both the borrowers' instructions and the tri-party agreement. Defendants had no duty to prepare and record an assignment and subordination of the lease.

Plaintiffs' own expert testified that the effect of the instructions was to order the removal of the lease from title; that instructions may be implied, and that lenders frequently specify the desired result while leaving the means to the escrow holder. Defendants did not breach the written terms of either the lender's or the borrowers' instructions. On the contrary, there was substantial evidence that preparation and execution of the cancellation was reasonably implied from the instructions.

*Recording Cancellation Without Approval of All Partners*

 Plaintiffs argue that defendants breached their fiduciary duty by recording the cancellation without the written consent of all the Kirk partners. This position is premised on the notion that Kirk Corporation was the lessor of the lease and that the consent of all Kirk partners was required to release any claim of the partnership.

The identity of the lessor has been the subject of shifting positions throughout this litigation. In their complaint, plaintiffs alleged that Noland was the lessor under the September 14, 1982, assignment of lease from Tahoe Ski Resorts. Defendants then raised an affirmative defense that plaintiffs had no cause of action because, at the time the cancellation was executed, Noland was not the owner of the property and did not have the authority to effectively cancel the lease. On summary judgment, defendants argued that plaintiffs suffered no damage because the cancellation, signed only by Noland, was void. On reconsideration, the trial court ruled that at the time the causes of action arose, the ownership interest was in Kirk Corporation under the conveyance of January 31, 1983 (undisputed fact No. 7) but that

the leasehold interest was in Noland as lessor, "having received that interest from Tahoe Ski Resorts on September 14, 1984," (undisputed fact No. 4).[3]

■ Absent a contrary agreement of the parties, " 'a sale by a lessor of real property during an unexpired term does not of itself abrogate the lease. Its effect is to grant all the rights of the original lessor to the grantee of the reversion. The grantee then becomes the landlord by operation of law and the tenant becomes a tenant of the grantee of the reversion.' (*Rosenkranz* v. *Pellin* (1950) 99 Cal.App.2d 650, 652 [ ]; *Commonwealth Memorial, Inc.* v. *Telophase Society of America* (1976) 63 Cal.App.3d 867, 870-871 [ ]." (*Peter Kiewit Sons' Co.* v. *Richmond Redevelopment Agency* (1986) 178 Cal.App.3d 435, 441 [223 Cal.Rptr. 728]; see *Macdonough* v. *Starbird* (1894) 105 Cal. 15 [38 P. 510]; *Standard Oil Co.* v. *Slye* (1913) 164 Cal. 435 [129 P. 589]; *Rosenkranz* v. *Pellin, supra,* 99 Cal.App.2d 650.) ■ In determining whether a grantor retains its rights under a lease on transfer of the property, the crucial question is what the parties intended. The general rule that on sale the grantee becomes the landlord by operation of law does not apply, however, where the grantor expressly reserves its rights under the lease. (*Commonwealth Memorial, Inc.* v. *Telophase Society of America, supra,* 63 Cal.App.3d at pp. 870-871 [purchaser held not entitled to bring unlawful detainer where grantor expressly excluded its lease right in the contract of sale].)

■ There is nothing in the record which would indicate that Noland retained his rights under the lease when he conveyed his interests in Lot 11 to the Kirk Corporation. The transfer of the lessor's interest occurred by operation of law when Noland conveyed all of his interest in Lot 11 to the Kirk Corporation, with an 80 percent interest in himself and a 10 percent interest each in Brown and the Hendersons. The partnership agreement described partnership property as "all property originally paid or bought into, or transferred to the partnership as contributions to capital by the partners, or subsequently acquired by purchase or otherwise, on account of the partnership . . . ." On January 28, 1983, when the cancellation was signed, the lessor's interest was in the Kirk Corporation.

Because Kirk was the lessor, plaintiffs argue that defendants breached their fiduciary duty by failing to have the cancellation signed by all partners

---

[3] Defendants filed a separate statement of undisputed material facts in support of their motion for summary judgment. Plaintiffs did not dispute some of those facts, which the court then determined to be undisputed. Undisputed fact No. 7 stated that "on January 31, 1983, a deed was recorded . . . which was signed January 28, 1983, by which Noland, Brown and Hendersons conveyed all of their interest in Lot 11 of Kirkwood Meadows Alpine Unit No. 1 to Kirk Corporation, . . ." Undisputed Fact No. 4 stated that "By document entitled 'Assignment of Lease' dated September 14, 1982, Tahoe Ski Resorts, Inc. assigned its interest in the Patrick Brown Lease of November 1, 1981, to Robert C. Noland. The said original Lease Assignment was not acknowledged." The court's decision incorrectly stated the date on which Noland received the lessor's interest as September 14, 1984.

and recording it without the written consent of all partners. They argue that defendants had actual and constructive notice of the unanimity requirement of the partnership agreement under Corporations Code sections 15009 and 15010.7. Under section 15009, all partners may act on behalf of the partnership "unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority." Section 15010.7 provides that a recorded statement of partnership restricting the authority of partners provides constructive notice of its contents. The partnership agreement was recorded at Foxworthy's request on January 31, 1983.

The partnership agreement, which was recorded after the execution of the cancellation agreement, did not provide Foxworthy with constructive notice of its contents. The presence of all of the partners at the execution of the cancellation document, however, did provide her with sufficient basis to conclude that Noland had authority. There is substantial evidence to support the court's conclusion that the signatures of Brown and Noland, when considered in the overall context of the loan transaction, constituted authorization for defendants to record the cancellation without further written instructions. Evidence indicated that the CCB loan would not close unless the lease was removed from title. All partners were present at the signing and Foxworthy described each document as it was passed for signature. The cancellation was signed by Brown and Noland, who jointly held a 90 percent interest in the partnership. Just days before, Henderson had asked how to remove a lease from title. The partnership needed the loan to pay off debts which were immediately due. Foxworthy gave the package of executed documents to Henderson to take to the county recorder. The history of the project reveals that the parties themselves did not require written consent to effectuate the unanimity provision of the partnership agreement. Noland continued to sign on behalf of the Kirk Corporation even after his authority to do so was rescinded by the second amended partnership agreement. In October 1983, Noland alone signed a Deed of Trust to the Bank of Hapoalim to secure an $850,000 loan. In November 1983, two months after Brown had traded in his partnership interest, Noland signed another deed of trust committing the partnership to a personal debt to Brown's ex-wife (Zicovich deed of trust for $270,000).

There was substantial evidence to support the court's conclusion that the recording of the cancellation was authorized without further written instructions. Accordingly, in recording the cancellation, defendants did not breach their fiduciary duty to plaintiffs.

## Breach of Obligations of a Notary

 Plaintiffs argue that, as a matter of law, Foxworthy breached her obligations of a notary (1) by notarizing documents without properly witnessing the signatures; (2) by altering the documents by inserting jurats without the consent of the parties to the escrow; and (3) by failing to keep records in the notary journal as required by statute. They argue that Foxworthy's failure to keep her journal precluded them from proving that they did not sign the cancellation of lease. They further argue that Foxworthy and First American were negligent by changing the jurats without prior consent of the parties.

The requirements for public notaries are set forth in Government Code sections 8205 and 8206. One of the duties of a notary is to "take the acknowledgment or proof of . . . instruments of writing executed by any person, and to give a certificate of such proof or acknowledgment, endorsed on or attached to the instrument. Such certificate shall be signed by the notary public. . . ." (Gov. Code § 8205, subd. (a)(2).) A notary is required to keep a sequential journal of all official acts performed as a notary, including the date, time and type of each official act; the character of every instrument acknowledged; the signature of the person whose signature is being notarized; a statement as to whether the identity of the individual was based on personal knowledge or satisfactory evidence. (Gov. Code § 8206.) The duties imposed by this section are not met by retaining photographic copies of instruments acknowledged. (*Bernd* v. *Eu* (1979) 100 Cal.App.3d 511 [161 Cal.Rptr. 58].) Where a notary engages in "official misconduct or neglect," the notary and the sureties on the notary's bond "are liable in a civil action to the persons injured thereby for all the damages sustained." (Gov. Code § 8214).

 Foxworthy did not breach her obligations as a notary by falsely acknowledging the execution of the cancellation of lease. There was substantial evidence that Noland and Brown signed the cancellation in her presence. Foxworthy testified that she remembered the cancellation because she had typed it herself that day after asking Peek for appropriate wording. She also remembered it because, of all the documents signed on January 28, only it required two signatures. The court found Foxworthy to be credible. The testimony of Rush and the internal memos support the conclusion that the cancellation was in existence on the 28th of January.

Foxworthy's subsequent changing of jurats and failure to properly maintain her notary journal present a different issue. She admitted changing the jurats after Rush advised her of her error. She was not present and did not personally attach the corrected jurat to the cancellation. She admitted

failing to keep her journal and was aware that this practice violated her obligations as a notary. Labrie testified that it is not an uncommon practice for escrow officers who are notaries to attach the jurats after the parties have signed and left. Section 8205 does not mandate that the acknowledgment be endorsed on or attached to the instrument in the presence of the person executing it. The failure to complete the acknowledgment at the time she affixed her signature and seal to the document, however, may be grounds for refusal, revocation or suspension of her commission. (Gov. Code § 8214.1, subd. (j).)

Foxworthy's conduct as a notary was admittedly less than model. Her actions do not support a finding of liability to plaintiffs, however. Civil liability for neglect of notarial duties can only be predicated on the existence of damages proximately caused by the conduct of the notary. (*Jordan* v. *O'Connor* (1950) 99 Cal.App.2d 632 [222 P.2d 322].) In this case, plaintiffs suffered no damages which were proximately caused by Foxworthy's lack of compliance with her notarial duties. Their only theory was that, by her failure to keep her journal, they were unable to prove that they did not sign the cancellation on January 28, 1983. The evidence of surrounding circumstances substantially supports the conclusion that plaintiffs signed the cancellation on the 28th of January because it was required to obtain the CCB loan and because the take-out commitment, required by the lender, would expire on January 31, 1983, if escrow did not close. Foxworthy personally knew Brown and Noland and therefore did not complete her journal. Their signatures, which she witnessed, authorized her to record the cancellation. The subsequent change of four person to two person jurat to reflect the facts therefore did not proximately cause damage to plaintiffs. Although Foxworthy's actions and/or omissions may be grounds for the revocation or suspension of her commission by the Secretary of State under Government Code section 8214.1, they do not render her liable to the plaintiffs under the facts of this case.

### FAILURE TO EXCLUDE DEFENDANTS' COUNSEL

■■■ Finally, there is no merit to plaintiffs' argument that the trial court erred by failing to disqualify defendants' attorney Regalia, whose firm had previously been engaged by plaintiffs to prepare CC&R's for Whiskey Run.

The ethics of the legal profession in California prohibit a lawyer from accepting employment adverse to a former client "relating to a matter in reference to which he has obtained confidential information by reason of or in the course of his employment by such . . . former client." (Rule 4-101, Rules Prof. Conduct.) ■■■ Under this rule, the threshold question is

" 'whether the former representation is "substantially related" to the current representation.' " (*Global Van Lines, Inc.* v. *Superior Court* (1983) 144 Cal.App.3d 483, 488 [192 Cal.Rptr. 609].) The applicability of rule 4-101 is dependent upon the particular facts of each case and " '[m]ere prior professional association with the former client is not enough.' " (*Johnson* v. *Superior Court* (1984) 159 Cal.App.3d 573, 578 [205 Cal.Rptr. 605].) "Although it is often stated that actual possession of confidential information need not be shown, this court has recently pointed out that the possession of confidential information will be presumed only when 'a substantial relationship has been shown to exist between the former representation and the current representation, and when it appears by virtue of the nature of the former representation or the relationship of the attorney to his former client confidential information material to the current dispute would normally have been imparted to the attorney . . . .' " (*Ibid.*)

 Plaintiffs made no such showing. Their declarations and papers failed to establish any substantial relationship between their representation by a former associate of defense counsel's firm and defense counsel's current representation of defendants in this action. There was no evidence to indicate that defense counsel had access to any confidential information which might raise a conflict of interest.

### DISPOSITION

The judgment is affirmed.

Puglia, P. J., and Sparks, J., concurred.