Filed 9/20/16  Stover v. Padayao CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| TOM STOVER, | |
| Plaintiff and Appellant, | G051682 |
| v. | (Super. Ct. No. 30-2013-00640835) |
| JOSEPH PADAYAO as Trustee, etc., et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Jamoa A. Moberly, Judge.  Affirmed.  Motion to strike portion of appellant's brief.  Granted.

Freeman, Freeman & Smiley, Jared A. Barry and Thomas C. Aiken, for Plaintiff and Appellant.

Nokes & Quinn, Lawrence P. Nokes; Vogt, Resnick & Sherak, Jeany A. Duff and David A. Sherak, for Defendants and Respondents.

Tom Stover appeals from a judgment rejecting his petition challenging certain provisions of the trust created by his uncle, Henry Perry, in 2010, and alleging elder abuse was committed against Perry. Stover contended the provisions of the trust which gave the bulk of his property to respondents Cynthia Padayao (Cynthia) and Joseph Padayao (Joseph) and their daughters, Sally and Annie Padayao (all four collectively the Padayaos), were invalid as the products of undue influence. He also contended Cynthia and Joseph misappropriated the trust funds. The court, acting as trier of fact, granted a motion for judgment in favor of the Padayaos at the close of Stover's case, finding no persuasive evidence Perry's gift to the Padayaos had been the product of undue influence, or the Padayaos committed elder abuse.

Stover contends the court erred by: (1) applying the wrong statutory scheme in determining whether Perry's gifts to the Padayaos met the test for presumptive undue influence; (2) misinterpreting the statutory test; (3) misconstruing the meaning of "undue benefit" under the common law undue influence test; (4) making factual findings that were unsupported by substantial evidence; (5) refusing to admit his mother's (Perry's sister's) calendars and notes into evidence; (6) admitting into evidence the billing records of the attorney who drafted the trust (the trust attorney) and the hearsay comments of a senior residential care referral worker; and (7) making irrelevant statements concerning Stover's standing in its statement of decision.

We find none of these contentions persuasive and affirm the judgment. The statutory scheme relied upon by the court applies to all trusts which became irrevocable after December 2010 and Perry's trust stated it would become irrevocable only upon his death, which occurred in 2012. Stover's effort to demonstrate the trust became irrevocable earlier, due to Perry's alleged incompetence, fails. And the court's interpretation of the applicable statute was proper. Although Perry received significant assistance from the Padayaos, the court concluded he was not "unable" to provide for his own needs for health, food, clothing or shelter. That conclusion tracks the statutory

2

language.  As for the common law undue influence test, we disagree with Stover's assertion an "undue benefit" is necessarily established in every case where the gift recipient is slated to receive more under the disputed instrument than he or she would have received had the decedent died intestate.  Instead, the court properly considered the overall circumstances of Perry's relationship with the Padayaos in determining his gift to them was not an "undue" benefit.

Stover's attack on the sufficiency of the evidence is flawed because it consists largely of a one-sided summary of the evidence Stover contends would have supported factual conclusions in his favor.  That is not the proper test.  Nor can we agree former Probate Code section 21351, subdivision (d)—even assuming it were applicable—precluded the court from basing findings on the testimony of either Cynthia or the trust attorney.  The trust attorney was not a recipient of any gift under the trust, and thus the court's reliance on her testimony would not have been restricted by that statute.

Stover's complaint about the court's failure to admit his mother's calendars and notes into evidence also fails.  He has not described the evidence with any particularity, which makes it impossible to demonstrate how the court might have abused its discretion in refusing to admit it.  The same is true regarding his complaints about the court's admission of the trust attorney's billing records and Cynthia's testimony about her conversation with the senior residential care referral worker.  Neither complaint describes the evidence with any particularity and neither is accompanied by any citation to the record or a demonstration of prejudice.  Those arguments are consequently waived.

Stover's assertion the court made "irrelevant" findings relating to his standing does not suggest any reversible error.  As Stover points out, the court concluded he had standing.  The inclusion of findings reflecting the complexity of that issue— whether strictly necessary to the court's decision or not—do not warrant reversal of the judgment.  We decline to infer, as Stover suggests, the court's findings reflected an improper belief as to his motives for filing the petition.

3

And finally, the Padayaos' motion to strike the declaration Stover attached to his opening brief is granted. The declaration purports to update this court on the status of Stover's mother and provides a photograph of her. This evidence is irrelevant to the issues presented on appeal, and the declaration is improper.

## FACTS[1]

Perry, a single man without children, died in December, 2012 at the age of 88. He was survived by his older sister, Virginia Stover (Virginia), Stover and two other nephews who are the sons of Perry's deceased sister. In June 2010, Perry executed the Henry M. Perry Trust dated June 28, 2010, the instrument at issue in this case (the trust). The trust specifies it is revocable during Perry's lifetime, but becomes irrevocable upon his death. The trust provides for gifts of $10,000 to be made to each "my Sister Virginia Stover," "my nephew Tom Stover" and "my nephew Lee Johnston."[2] It otherwise specifies the remainder of the trust property, after distribution of any tangible personal property designated by memo, and the payment of all expenses and taxes, is to be distributed 80 percent to Cynthia and Joseph jointly, and 10 percent to each of their two daughters. Cynthia was designated cotrustee of the trust, along with Perry.

The trust explains, in article two, Perry is "providing for all of my family in this agreement. For my sister Virginia . . . and my two nephews . . . Stover and . . . Johnston, I am providing monetary benefits. At the time of this agreement, my

[1] Although the well-settled rules of appellate procedure require us to view the record in the light most favorable to the judgment, and require an appellant challenging the sufficiency of the evidence to provide us with a summary of *all* the evidence relating to the trial court's challenged findings, both positive and negative, Stover has ignored both of those requirements. Instead, he has provided us with a startlingly one-sided statement of facts, replete with argumentative subheadings. Similarly, the statement of facts is riddled with conclusory accusations. Such inflammatory contentions have no place in Stover's opening brief, and we disregard them.

[2] The trust makes no reference to, or provision for, Perry's third nephew, and Stover emphasizes this omission as evidence Perry lacked competence.

4

sister Virginia was almost ninety years of age and I do not feel she has long to live.  I am not giving her a greatly significant sum mostly due to her age and medical prognosis. Instead, I am mainly providing for my long-standing and dear friends, the Cynthia and Joseph Padayao Family.  They have been close to me for almost thirty years.  Cynthia and Joseph now completely care for me, including Annie and Sally, their two daughters. I consider Cynthia and Joseph my 'children,' and Annie and Sally my 'grandchildren.' The entire family provides me with comfort and company, beyond my daily needs.  Thus, while I have no immediate family of my own, I have the Padayo's [*sic*] and consider them my own family."  According to the trust attorney, that statement summarizes what he told her about his biological family and the Padayaos when they met to discuss the trust.  In fact, Perry objected to the original version of this article drafted by the trust attorney because it identified the Padayaos as merely friends, and Perry did not believe it accurately reflected the close familial attachment he felt toward them.

Perry lived in Laguna Beach, on a two-family property he purchased in the 1950's and originally shared with his mother.  The Padayaos moved into the second residence on Perry's property in 1984, after Perry's mother died.  Over the course of years the Padayaos lived next door to Perry, they developed an increasingly close relationship with him, celebrating all holidays and birthdays with him.  As Perry aged, the Padayaos, especially Cynthia, offered him increasing amounts of assistance, including driving him to appointments, helping him with cooking, laundry, car maintenance and caring for his cat.

Perry spoke to Virginia on the phone regularly.  Neither of them expected he would leave her anything in his will, because she was older, and in poor health. Stover, who lived in Torrance, had only sporadic contact with Perry, seeing him three times between 1981 and Perry's death—most recently in 2006.

David McDonnell, Perry's longtime financial and tax advisor, had been encouraging Perry for years to prepare an estate plan, and when Perry told him he was

5

finally doing it in 2010, McDonnell called him to verify it was what he wanted to do. McDonnell explained his purpose in calling Perry was "[t]o make sure that the client had a reasonable understanding of what he was planning to do." Based upon their conversation, McDonnell concluded Perry "seemed to have his marbles together, and that's what he was planning."

Once Perry decided to prepare an estate plan, both he and Cynthia located the same trust attorney through different sources. Perry found the trust attorney's name in the phone book, and she was also referred to Cynthia by an employee at Wells Fargo Bank. It was Cynthia who first called the trust attorney to set up the meeting with Perry, and she helped Perry prepare for the meeting, including filling out the trust attorney's client worksheet. When the trust attorney met with Perry, he demonstrated a command of his assets and a sophisticated understanding of financial issues. After the trust attorney completed the initial draft of the trust, she met with him alone for a couple of hours, and together they reviewed the document page by page.

The trust attorney was trained in elder law issues, and she recognized "red flags" when she first met Perry and learned he wanted to leave the bulk of his property to Cynthia. She wanted to make sure Perry knew what he was doing, so she "asked him a lot of questions and listened." Perry told her "he spent holidays with [the Padayaos] spent birthdays with them, that [Cynthia] sometimes cooked for him, that they grocery shopped together, that they did everything." He also told her the Padayaos "were like family" and Cynthia "was like his daughter."

In April 2011, nearly a year after Perry created the trust, the Padayaos became concerned Perry's declining health meant he needed more care than he could be given at home. They began looking for alternatives, and in July 2011, they found a licensed residential care home called "Rainbow Cottage." Perry moved into Rainbow Cottage in August 2011 and lived there until his death in December 2012.

6

In March 2013, Stover filed his petition challenging the validity of the trust, and alleging the Padayaos were guilty of elder abuse. He filed an amended petition in November 2013, seeking to invalidate the donative transfers to the Padayaos, to have Cynthia surcharged for alleged breaches of trust, and to recover damages for elder abuse.

The case was tried to the court, sitting without a jury. There were numerous witnesses, including the Padayaos, Stover, the trust attorney, McDonnell, Perry's old friend Frank Winslow, who had known him since high school, and three physicians (Perry's personal physician and an expert witness hired by each side) all of whom opined about Perry's mental acuity. Virginia did not testify, but her earlier deposition was admitted into evidence.

At the close of Stover's case-in-chief, the court granted the Padayaos' motion for judgment in their favor. The court issued a lengthy statement of decision explaining the basis of its ruling. Among other things, the court found Perry "had testamentary capacity when he . . . created the Trust and related instruments," and he "understood the nature and extent of his property." "He remembered and understood his familial relations, his relationships to his living descendants and their interests in his will." The court stated Perry's command of that information "need not be perfect."

The court emphasized the trust attorney "testified of specific instances in which [Perry] identified those he wanted to benefit, and stated the reasons that motivated him to do so. He identified to her his assets." Further, "Perry initially met privately for 1 1/2 to 2 hours with [the trust attorney] to discuss his estate planning, and . . . he significantly participated in this meeting discussing the documents involved in his estate planning and how these legal instruments would further his planning goals." Moreover, the court stated "[t]he evidence is clear that he had little contact with . . . Stover, or [Virginia]," and "[Virginia] did not expect a bequest."

The court rejected Stover's common law undue influence claim, stating while Stover "show[ed] by a preponderance of evidence that a confidential relationship

7

existed between the Padayaos," and also Cynthia "actively participated in procuring a Trust," the court was not persuaded the trust conferred an undue benefit on the Padayaos. The court explained "[i]f one looks at care and concern in [Perry's] life, the benefits bestowed on the Padayaos do not appear inappropriate."

The court specifically concluded Perry's gift to the Padayaos was an equitable result. The court stated "the evidence presented indicates clearly that the only equitable result is exactly what . . . Perry intended and communicated to [the trust attorney], that he wished to benefit the Padayaos, whom he considered his family given their longstanding relationship, while at the same time still providing a benefit for those family that had little contact with him; [Virginia], . . . Stover and [Johnston]."

The court also rejected Stover's contention Perry was vulnerable to undue influence, noting "[a]lthough there was some evidence of . . . Perry having some concerns about falling, resulting him at times using a cane, a walker and a wheelchair, in the first meeting with [the trust attorney] in June 2010, she testified that . . . Perry was walking her around his property, showing her his garden, the alley and portions of his home unaided." And although there was evidence Cynthia "was assisting . . . Perry in his bill paying, . . . due to . . . Perry having a shaky hand," the court concluded "[n]o evidence was presented to prove that . . . Perry was not conducting his own financial affairs. To the contrary, until he moved to Rainbow Cottage, [Perry] had his mail delivered to his own locked mailbox for which he was the only person with the key."

The court likewise rejected Stover's assertion the Padayaos had isolated Perry from his family or friends, or engaged in other coercive tactics to increase his dependence upon them. The court found "no relevant, admissible evidence . . . presented that any of the Padayao family controlled . . . Perry's necessities of life, medication, interactions with others, information or sleep at any time."

The court concluded Stover failed to make a persuasive case showing presumptive undue influence under Probate Code section 21366 because Perry "was not a

8

dependent adult," and the Padayaos were not "care custodians" as defined in the statute. However, the court's reasoning demonstrated the latter finding was based solely on the former: "[Stover] has failed to show, by a preponderance of the evidence that the Padayaos were 'care custodians,' as set forth in Probate Code [section] 21364, because [he] failed to show that [Perry] was a 'dependent adult' as defined by [the statute]." (Italics omitted.) And the court rejected the assertion Perry was a "dependent adult" at the time he established the trust because Stover "failed to show by preponderance of evidence that as of June of 2010 [Perry] was *unable* . . . to provide properly for his personal needs for physical health, food, clothing or shelter." The court noted that finding was "somewhat of a close call in this regard—partially because after the execution of the Trust, [Perry] was starting a more rapid physical decline. But it must be noted that [Perry] was well over the age of 80."

In rejecting the assertion Perry was unable to provide for his own needs, the court relied on the testimony of the trust attorney, and on the facts that Perry managed his own mail and banking, dressed himself, prepared his own meals and lived in his own home. The court stated there was "[n]o relevant admissible evidence . . . that the 'help' [Cynthia] provided to . . . Perry in 2010 was provided because . . . Perry was a dependent adult and because of a dependent condition."

The court also rejected Stover's contention Perry suffered from any mental deficits caused him difficulty in managing his financial resources or resisting fraud or undue influence. On that point, the court emphasized the opinion of Perry's treating physician, who concluded as of July 2011, Perry was suffering from only mild cognitive impairment, as opposed to dementia. The court also noted Stover's expert witness testified he could not state with reasonable medical certainty that at the time Perry established the trust, he was suffering from dementia.

And finally, the court rejected Stover's contention the Padayaos had engaged in elder abuse by using the trust funds for renovation of Perry's home while he

9

was living at Rainbow Cottage. The court explained while it might have been preferable for Perry's money to be used to care for him "in a more luxurious fashion," the money was used to enhance his own property, and it was "not inconceivable that he would recover and be able to return from the Rainbow Cottage." Otherwise, the court determined all the trust funds expended between the date the trust was established, and the date of Perry's death, had been expended for his benefit, except for $36,000—an amount the court deemed "not unreasonable co-trustee compensation for nearly 18 months of trust administration." The court concluded there was no evidence any of the Padayaos "took secreted, appropriated, obtained or retained" any of Perry's property "with the intent to defraud . . . Perry or for any wrongful use."

## DISCUSSION

### 1. Standard of Review Following the Grant of a Motion for Judgment

The judgment was entered following the Padayaos' motion for judgment in accordance with Code of Civil Procedure section 631.8. The statute states in pertinent part "[a]fter a party has completed his presentation of evidence in a trial by the court, the other party, without waiving his right to offer evidence in support of his defense or in rebuttal in the event the motion is not granted, may move for a judgment. The court as trier of the facts shall weigh the evidence and may render a judgment in favor of the moving party." (Code Civ. Proc., § 631, subd. (a).)

In reviewing the court's order granting a motion for judgment at the close of Stover's case, we are bound by the same rules that would govern review of a judgment entered after the Padayaos had put on their defense. "The purpose of a motion for judgment is to allow the trial court to dispense with the need for a defendant to produce evidence when, after weighing the evidence at the close of the plaintiff's case, it is persuaded that the plaintiff has failed to sustain its burden of proof. [Citation.] In weighing the evidence on a motion for judgment at the close of the plaintiff's case, the trial court may exercise its prerogatives as a fact finder by refusing to believe witnesses

10

and by drawing conclusions at odds with expert opinion. [Citations.] [¶] In reviewing a judgment granted in favor of defendant after the plaintiff has completed its presentation of evidence in a court trial, the evidence is viewed most favorably to the defendant and the judgment must be supported by substantial evidence. [Citation.] The function of the reviewing court is to determine whether the judgment is supported by any competent and substantial evidence. [Citations.] The trial court's findings in granting a motion for judgment are entitled to the same respect on appeal as any other findings and are not reversible if supported by substantial evidence. [Citation.] When two or more inferences can be reasonably deduced from the evidence, the reviewing court is without power to substitute its deduction for those of the trial court." (*Kirk Corp. v. First American Title Co.* (1990) 220 Cal.App.3d 785, 806.)

2. *Applicable Statutory Scheme Governing Undue Influence*

In assessing Stover's claim Perry's gift to the Padayaos was the product of undue influence, the court relied on Probate Code section 21360, et seq. (the new law). Stover contends the court erred by applying the new law, and should instead have applied former Probate Code section 21350, et seq. repealed effective January 1, 2014 (Stats. 2010, ch. 620, § 6), in determining whether Perry's gift to the Padayaos should be invalidated as the product of undue influence. We do not agree.

Stover acknowledges the new law is expressly made applicable to "instruments that become irrevocable on or after January 1, 2011," (Prob. Code, § 21392, sub. (a)) and the trust specified it was revocable by Perry during his lifetime. Hence, by its terms, the trust did not become irrevocable until Perry's death in December 2012— *after* the effective date of the new law. However, Stover argues the trust became irrevocable, as a matter of law, when Perry became incompetent, and "[t]he evidence showed that [Perry] lacked capacity to revoke the trust by January 1, 2011."

The argument is unpersuasive. Although there was evidence Perry suffered from mild cognitive impairment as early as 2010, the evidence certainly did not establish

11

he had entirely lost the capacity to make testamentary decisions, such as revocation of the trust, by January 1, 2011.  Probate Code section 811 (section 811) sets forth the complicated analysis required to determine whether "a person is of unsound mind or lacks the capacity to make a decision or do a certain act, including, but not limited to, the incapacity to contract, to make a conveyance, to marry, to make medical decisions, to execute wills, or to execute trusts."  (*Id*., subd. (a).)  Stover has made no effort to address that analysis.

Among other things, section 811 specifies "[t]he mere diagnosis of a mental or physical disorder shall not be sufficient in and of itself to support a determination that a person is of unsound mind or lacks the capacity to do a certain act."  (*Id*., subd. (d).)  Instead, "[a] deficit in the mental functions listed above may be considered only if the deficit, by itself or in combination with one or more other mental function deficits, significantly impairs the person's ability to understand and appreciate the consequences of his or her actions *with regard to the type of act or decision in question*."  (*Id*., subd. (b), italics added.)

This significant impairment standard is particularly difficult to meet in the case of testamentary capacity because it is well-settled "'[t]he standard for testamentary capacity is exceptionally low.'"  (*Doolittle v. Exchange Bank* (2015) 241 Cal.App.4th 529, 545.)  In fact, "'[i]t has been held over and over in this state that old age, feebleness, forgetfulness, filthy personal habits, personal eccentricities, failure to recognize old friends or relatives, physical disability, absent-mindedness and mental confusion do not furnish grounds for holding that a testator lacked testamentary capacity.'"  (*Estate of Mann* (1986) 184 Cal.App.3d 593, 603.)

Further, section 811 states "[i]n determining whether a person suffers from a deficit in mental function so substantial that the person lacks the capacity to do a certain act, the court may take into consideration *the frequency, severity, and duration of periods of impairment*."  (*Id*., subd. (c), italics added.)  Stover's assertion Perry lacked capacity to

12

revoke the trust by the end of 2010 fails to acknowledge even if a person suffering from cognitive impairment might be found incompetent at certain times, that finding would not necessarily establish the incompetency persisted at all times thereafter. (See *Estate of Mann*, *supra*, 184 Cal.App.3d 593 [dementia sufferer placed under conservatorship nonetheless had periods of lucidity during which she was competent to make a will].) So even if it were true Perry had become incompetent to revoke the trust during some periods in 2010, that would not necessarily establish he had forever lost the capacity to do so by 2011. Consequently, we reject Stover's assertion the trust had become irrevocable, due to his lack of capacity, by January 2011.

Alternatively, Stover argues the trust became irrevocable before January 1, 2011 (and thus was not subject to the new law) because it was "irrevocable (if not invalid) *ab initio* as the product of undue influence." This argument makes no sense. While the trust might be *invalid* if it were the product of undue influence, it could not be described as *irrevocable* on that ground. Consequently, we reject Stover's assertion the court erred by applying the new law to the trust.

Probate Code section 21380 is the operative provision in the new law, and creates a presumption a donative transfer is the product of fraud or undue influence if certain factual circumstances are proved. As pertinent here, it states: "A provision of an instrument making a donative transfer to any of the following persons is presumed to be the product of fraud or undue influence: [¶] . . . [¶] (3) A care custodian of a transferor who is a dependent adult, but only if the instrument was executed during the period in which the care custodian provided services to the transferor, or within 90 days before or after that period." (Prob. Code, § 21380, subd. (a).) The statutory presumption "is a presumption affecting the burden of proof" and "may be rebutted by proving, by clear and convincing evidence, that the donative transfer was not the product of fraud or undue influence." (*Id*., subd. (b).)

13

A "care custodian" is defined as "a person who provides health or social services to a dependent adult, except that 'care custodian' does not include a person who provided services without remuneration if the person had a personal relationship with the dependent adult (1) at least 90 days before providing those services, (2) at least six months before the dependent adult's death, and (3) before the dependant adult was admitted to hospice care, if the dependent adult was admitted to hospice care." (Prob. Code, § 21362, subd. (a).) For the purposes of this section, "health and social services" means "services provided to a dependent adult because of the person's dependent condition, including, but not limited to, the administration of medicine, medical testing, wound care, assistance with hygiene, companionship, housekeeping, shopping, cooking, and assistance with finances." (*Id*., subd. (b).)

And a "dependent adult," is defined, in pertinent part, as "a person who, at the time of executing the instrument at issue under this part, was . . . [¶] . . . 65 years of age or older and satisfied one or both of the following criteria:  [¶] (1) The person was unable to provide properly for his or her personal needs for physical health, food, clothing, or shelter.  [¶] (2) Due to one or more deficits in the mental functions listed in paragraphs (1) to (4), inclusive, of subdivision (a) of Section 811, the person had difficulty managing his or her own financial resources or resisting fraud or undue influence." (Prob. Code, § 21366.)

If the challenged gift is found to be the product of fraud or undue influence, "the instrument making the gift shall operate as if the beneficiary had predeceased the transferor without spouse, domestic partner, or issue." (Prob. Code, § 21386.)

*3. Court's Application of the Statutory Law*

Stover claims the court misapplied former Probate Code section 21350 for two reasons.  However, as we have already explained, this case is governed by the new law, not the repealed provisions of the Probate Code.  Nonetheless, we address Stover's

14

contentions, because the new law uses the same terminology Stover contends was misapplied from the repealed statutes.

Stover first argues the court erred by concluding the Padayaos were Perry's "care-givers" but not his "care-custodians," noting that "is not a distinction recognized by the law." But the point misconstrues the court's reasoning. The court's determination the Padayaos were not "care-custodians" under the statute was based entirely on its finding Perry was not a "dependent adult" *under the new law*. As the court explained, "Section 21362 [subdivision] (a) of the *Probate Code* defines 'care custodian' as 'a person who provides health and social services to a dependent adult'" and "[Stover] has failed to show, by a preponderance of the evidence that the Padayaos were 'care custodians,' as set forth in *Probate Code* [section] 21364, because [he] failed to show that [Perry] was a 'dependent adult' as defined by [the statute]." We find no error in this reasoning.

Stover also challenges the court's interpretation of what it means to be a "dependent adult," under the statute, arguing it was "[too] confusing, too narrow and erroneous as a matter of law" because it focused on whether Perry was "'unable' to properly care for his personal needs." Stover claims the court's focus on Perry's *inability* to provide for his needs conflicts with former Probate Code section 21350, subdivision (c), and the cases interpreting it. But again, those repealed Probate Code statutes—and by extension the cases interpreting them—do not apply to this case. Instead, the applicable statute is Probate Code section 21366, which explicitly defines a "dependent adult," in terms of whether the person is "*unable* to provide properly for his or her personal needs for physical health, food, clothing, or shelter." (Prob. Code, § 21366, italics added.) The court did not err by applying the exact statutory language and determining Perry did not qualify as a dependent adult.

In any event, the cases Stover relies upon, *Estate of Shinkle* (2002) 97 Cal.App.4th 990, disapproved on another ground in *Bernard v. Foley* (2006) 39 Cal.4th

15

794, 816, fn. 14, and *Estate of Odion* (2006) 145 Cal.App.4th 152, are both distinguishable for the additional reason neither represents a challenge to the court's determination that a decedent *was not* a dependent adult. Thus, neither case establishes the decedent's particular circumstances would *compel* a finding he or she was a dependent adult—which is the argument Stover seems to be making in this case. Indeed, Stover himself acknowledges these cases demonstrate only "[e]vidence of infirmity and daily assistance with personal needs *is sufficient* for a finding of a dependent adult." (Italics added.) That may be correct, even under the current law, but it is not a basis for overturning the court's contrary conclusion in this case.

*4. Common Law Claim of Undue Influence*

Stover also contends the court erred in rejecting his assertion the burden shifted to the Padayaos to prove the validity of the trust under the common law doctrine of undue influence. As Stover points out, the common law doctrine continues to exist alongside the statutory one: "[T]his statutory scheme supplements the common law doctrine that 'a presumption of undue influence, shifting the burden of proof, arises upon the challenger's showing that (1) the person alleged to have exerted undue influence had a confidential relationship with the testator; (2) the person actively participated in procuring the instrument's preparation or execution; and (3) the person would benefit unduly by the testamentary instrument.'" (*Bernard v. Foley*, *supra*, 39 Cal.4th 794, 800.)

And in this case, the court did find the first two elements of the common law doctrine (confidential relationship & active participation) were established. However, the court concluded Stover's reliance on the common law doctrine fell short of shifting the burden to the Padayaos because the third element—undue benefit—had not been established. Stover contends that conclusion was erroneous as a matter of law.

According to Stover, the element of "undue benefit" is necessarily established any time the benefit conferred in the disputed instrument exceeds what the recipient would have received under the laws of intestate succession, citing *Estate of*

16

*Trefren* (1948) 86 Cal.App.2d 139, 148-149 (*Trefren*); *Estate of Baker* (1982) 131 Cal.App.3d. 471, 489-481 (*Baker*); and *Estate of Leonard* (1949) 92 Cal.App.2d. 420, 429 (*Leonard*). But none of those cases establishes such a rule.

Instead, in both *Trefren* and *Baker*, the trier of fact had concluded undue influence *was* established, and thus the appellant was asserting the evidence had been *insufficient as a matter of law* to support that conclusion. So in both cases, the appellate court merely stated the evidence showing the recipient would have received nothing in the absence of the disputed instrument was *sufficient to support* the element of undue benefit—but not that it *compelled* such a finding. Indeed, this posture was emphasized by the *Trefren* court, which noted the verdict might have gone either way: "If the verdict of the jury had been in favor of appellant, his argument would be very helpful in pointing out evidence in support of such verdict, but in the face of the adverse verdict of the jury upon this issue the testimony pointed out and relied upon by appellant merely accentuates the conflict in the testimony, and, as hereinbefore pointed out, it was the province of the jury to weigh the evidence." (*Trefren*, *supra*, 86 Cal.App.2d at p. 150.)

And in *Leonard*, the court had entered a nonsuit in favor of the alleged undue influencer, having concluded the evidence was *legally insufficient* to submit the issue to the jury. On appeal, the court determined "since the record contains evidence, although contradicted, from which the jury could reasonably conclude that a confidential relation existed between the testator and beneficiaries, that the latter actively participated in the preparation of the will and that they unduly profited thereby, the issue of undue influence should have been submitted to the jury." (*Leonard*, *supra*, 92 Cal.App.2d at p. 429.) Again, the court did not conclude an undue benefit had been established.

Thus, while Stover's cases demonstrate evidence of a benefit which exceeds what the recipient would have received in the absence of the disputed instrument would be *sufficient* to sustain a finding of undue benefit, neither holds it would *require* such a finding. Moreover, we note such a rule, if it existed, would seem to equate *any*

17

benefit received under a disputed instrument with an *undue* benefit, thus rendering the word "undue" wholly superfluous.

Instead, as the Padayaos point out, the ultimate assessment of whether the benefit received by a recipient under a disputed instrument was "undue" is actually based on a holistic analysis of several factors, including the quality of the relationships involved. We conclude Stover has failed to demonstrate the court erred in finding Perry's gifts to the Padayaos were not an "undue benefit" to them.

*5. Substantial Evidence Challenge*

Stover also challenges the sufficiency of the evidence to support the judgment entered in favor of the Padayaos. Succeeding on such a challenge is difficult because "[a]n appellate court '"must *presume* that the record contains evidence to support every finding of fact . . . ."' [Citations.] It is the appellant's burden, not the court's, to identify and establish deficiencies in the evidence. [Citation.] This burden is a 'daunting' one. [Citation.] 'A party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence* on that point, *favorable and unfavorable,* and *show how and why it is insufficient*. [Citation.]'" (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409.)

Moreover, the appellant "'cannot shift this burden onto respondent, nor is a reviewing court required to undertake an independent examination of the record when appellant has shirked his responsibility in this respect.'" (*Huong Que, Inc. v. Luu*, *supra*, 150 Cal.App.4th at p. 409.) And when the appellant fails to satisfy that burden, the substantial evidence challenge is waived. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 ["an attack on the evidence without a fair statement of the evidence is entitled to no consideration when it is apparent that a substantial amount of evidence was received on behalf of the respondent"].)

In this case, Stover falls well short of meeting that burden, and thus his substantial evidence challenge fails. As we have already noted, his lengthy statement of

18

facts is wholly one sided, essentially ignoring any evidence that supported the court's findings. What supporting evidence is not ignored is derided or dismissed as lacking in credibility. This is not consistent with an appellant's burden when asserting a lack of substantial evidence.

Moreover, Stover's entire substantial evidence argument is contained in eight pages of his opening brief. It is also wholly one sided, and to the extent it acknowledges any evidence supporting the judgment, it again does so only for the purpose of discounting or discrediting that evidence. For example, Stover acknowledges there is substantial evidence to uphold the court's judgment, but only as a prelude to arguing that evidence should be ignored: "[the Padayaos'] case and the court's decision rested primarily on the shoulders of [the trust attorney] and her testimony about her meetings and discussions with [Perry]. Her testimony was often in total conflict with the written evidence. [The trust attorney] and [Cynthia] changed their stories multiple times from deposition to trial and, at moments during trial, they admitted as much." Stover then describes, without citation to the record, one purported instance, in which "[the trust attorney's] testimony about her final draft of the Trust and meeting with [Perry] on June 25, 2010 was refuted . . . over and over by objective evidence, even her and her legal assistant's emails on June 22, indicating that the Trust would be dated June 28."

After this conclusory and unsupported description of the evidence, Stover points out "[e]ven under the substantial evidence standard, the appellate court does not need to accept the court's erroneous findings based on objectively false testimony." Whatever the truth of that assertion, however, Stover's bare assertion of evidentiary conflicts would be an insufficient basis to establish its applicability here.

Stover next claims "it should also be noted that, under [former] Probate Code [section] 21351[subdivision] (d), which should have been applied by the court, the court was prohibited from basing its decision 'solely upon the testimony' of [the trust attorney] or [Cynthia]." We reject that assertion as well.

19

According to Stover, the court violated former Probate Code section 21351, subdivision (d) by making several specific factual findings that could only be based on the testimony of either the trust attorney or Cynthia—e.g., "'[Perry] found [the trust attorney] in the phone book'" and "'[Perry] significantly participated in his meeting with [the trust attorney] and discussed documents involved in his estate planning and how these legal instruments would further his planning goals.'"  But even if we believed the former statutory scheme applied to this case—and as we have already concluded, it does not—the assertion is fatally flawed.

First, the prohibition Stover relied upon applied only to a court's overall determination the transfer was not the product of fraud, menace, duress or undue influence (former Prob. Code, § 21351, subd. (d)), but did not prohibit the court from basing a particular *factual finding* on such testimony.  And second, the court's reliance on the *trust attorney's* testimony would not have been prohibited by the statute.  The prohibition applies only to the testimony of "any person described in subdivision (a) of Section 21350" and that provision describes only classes of persons who are recipients of a donative transfer.  In this case, the trust attorney was not a recipient.

And having rejected Stover's claim no factual finding could be based on the testimony of the trust attorney or Cynthia, much of his substantial evidence argument crumbles.  For example, Stover challenges the sufficiency of the evidence to support the court's finding Perry "had testamentary capacity at the time he executed the Trust."  But Stover implicitly concedes that finding was supported by the testimony of both the trust attorney and Cynthia:  among other things he claims "other than the testimony of [the trust attorney] and [Cynthia], there is no evidence whatsoever that [Perry] participated in the estate planning process."

Additionally, Stover acknowledges the attorney testified Perry was walking freely around his property without assistance when she met with him to discuss the trust, but complains that testimony was "in conflict with the medical records."  Even so, the

20

trust attorney's testimony is still substantial evidence the court could believe.[3] Similarly, the fact the trust attorney's testimony about Perry's apparent physical condition, as well as her description of the interior of his home, may have been undermined by other evidence, does not preclude the court's reliance on it. "[N]either conflicts in the evidence nor '"testimony which is subject to justifiable suspicion . . . justif[ies] the reversal of a judgment, for it is the exclusive province of the [trier of fact] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.'"" (*Oldham v. Kizer* 235 Cal.App.3d 1046, 1065.)

Indeed, testimony credited by the trier of fact cannot be disregarded on appeal unless it is *inherently* improbable; mere implausibility, or the existence of other evidence which undermines it, is insufficient. "The 'inherently improbable' standard for rejecting testimony on appeal is not merely an enhanced version of implausibility . . . . '*Highly* implausible' is still an argument reserved for the trier of fact. Inherently improbable, by contrast, means that the challenged evidence is 'unbelievable per se,' . . . such that 'the things testified to would not seem possible.' [Citation.] The determination of inherent improbability must be made without resort to inference or deduction, and thus cannot be established by comparing the challenged testimony to other evidence in the case." (*People v. Ennis* (2010) 190 Cal.App.4th 721, 725.)

Otherwise, Stover merely points to other evidence suggesting Perry did not have testamentary capacity at the time he executed the trust, or he quibbles about the credibility or persuasive value of evidence suggesting Perry had capacity: e.g., Stover claims Perry had difficulty remembering details called for in the trust attorney's client worksheet, and questions the credibility of Cynthia's testimony she assisted Perry in filling it out because of his "severely shaking hands." Similarly, Stover challenges the

---

[3] In any event, Stover fails to mention the trust attorney's testimony was consistent with that of Winslow, who described a visit with Perry in 2010, during which Perry was walking unaided.

court's recitation in the statement of decision that Perry's doctor *testified* Perry had exhibited "'mild cognitive impairment'" in July 2011, when the doctor had merely testified he had checked that box on a form because the only alternative was "'Dementia.'" At most, this assertion suggests the doctor's characterization of Perry's condition was not a particularly detailed or persuasive one; it does not show a lack of substantial evidence.

Stover also contends some of the court's findings on the issue of undue influence lacked evidentiary support. He points specifically to the court's findings "[n]o relevant, admissible evidence was presented that [the Padayaos] controlled [Perry's] necessities of life, medication, interaction with others, information or sleep at any time," and "[n]o evidence was presented to prove [Perry] was not conducting his own financial affairs or could not resist undue influence." With respect to both findings, Stover focuses on the phrase "no evidence" and argues the finding of "no evidence" was unsupported because there was plenty of evidence in the record which would have supported the opposite conclusion on those points.

The argument is a red herring. This was not a summary judgment, and the court was not required to find the relevant facts to be undisputed. The court was required only to determine whether it was *persuaded* of the facts that would support Stover's undue influence claim. These challenged findings demonstrate it was not. Indeed, the latter finding specifically stated no evidence was presented *to prove* the claimed fact; the court did not find no evidence supported it. And as to the initial finding, the salient issue was whether the Padayos *controlled* Perry's necessities of life; not whether they offered him assistance with those necessities. The evidence highlighted by Stover rebuts only the latter point: "The record is replete with evidence [the Padayaos] drove [Perry's] car, aided him with daily hygiene, grooming and bathing, monitored who came to the . . . Property to see [him and] managed [his] finances." Those assertions might all be

22

true, and still not demonstrate the Padayaos were "controlling" Perry's life. Thus, that evidence does not reflect an insufficiency of evidence to support the judgment.

Stover claims the evidence was insufficient to support the court's finding no undue benefit was conferred on the Padayaos. But Stover's argument is merely a combination of his earlier assertion that because the Padayaos are not Perry's "blood relatives," they have received an undue benefit as a matter of law, and an assertion the court "seemed to display a hidden, unknown bias" because it failed to credit the evidence Stover believed demonstrated the closeness of Perry's relationship with both his mother and himself. Neither of those contentions is an attack on the sufficiency of the evidence, and we reject them. As to the latter point, we certainly will not infer the court harbors a bias against the losing party based on nothing more than its failure to be persuaded by his evidence.

Stover challenges the sufficiency of the evidence to support the court's findings on his elder abuse claim. However, he simply claims (without relevant citations to the record) there was evidence contrary to the court's findings which "compelled a different finding." And while there might be other fact finders who would agree with that contention, it does not establish the evidence before the court was insufficient to support its findings. We consequently reject that claim.

Stover also complains the court's determination only $36,000 of the trust money was unaccounted for "did not cite any evidence, was not in the court's oral statement of decision and is utterly unsupported." That assertion is itself unsupported by any citation to either the record or to any legal authority for its implied claims (1) the court's written statement of decision is confined to the issues addressed in its oral tentative decision, or (2) a statement of decision is required to cite evidence. Those assertions are consequently waived. In any event, both are also incorrect. The court's oral pronouncement of a tentative decision is superseded by its written statement of decision. (*Taormino v. Denny* (1970) 1 Cal.3d 679, 684; *Canal-Randolph Anaheim, Inc.*

23

*v. Wilkoski* (1978) 78 Cal.App.3d 477, 494 ["a court is not bound by its statement of intended decision and may enter a wholly different judgment than that announced"].) Indeed, it is incumbent upon the parties to point out any deficiencies in the court's proposed findings so they may be corrected. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130.) And the only requirement for a statement of decision is that it set forth "the [court's] written findings of fact and conclusions of law." (Code Civ. Proc., § 632.) If what Stover really means to suggest is the evidence was insufficient to support the court's finding only $36,000 of the trust money was unaccounted for, he was required to do so by summarizing the entirety of the evidence on that point, and explain why it was insufficient. He has failed to do that.

*6. Evidentiary Rulings*

Stover next argues the court abused its discretion with respect to three of its evidentiary rulings. As he acknowledges, we review the court's ruling on admission of evidence for an abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717-718.) What he does not acknowledge is even assuming the court erred in its evidentiary rulings, reversal of the judgment would be warranted only if "after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) Stover was required to demonstrate "it is reasonably probable a result more favorable to [him] would have been reached absent the error." (*California Crane School, Inc. v. National Com. for Certification of Crane Operators* (2014) 226 Cal.App.4th 12, 24.)

Establishing both of those elements—error and prejudice—is a significant burden, and one Stover has made no effort to meet. Instead, Stover's evidentiary arguments are cursory, at best. He first asserts the court abused its discretion by refusing to admit into evidence Virginia's calendars and notes. He explains he sought to admit only the portions of her calendars and notes that were relevant to Perry, but does not otherwise describe what portions of calendars and notes he is referring to, nor does he

24

identify what specific information those portions would have revealed. Further, Stover does not acknowledge the basis on which the Padayaos objected to admission of these documents, and hence makes no effort to explain why that objection was not meritorious. This falls far short of persuading us the court abused its discretion by refusing to admit whatever portions of the calendars and notes he is referring to.

And as to prejudice, Stover merely asserts, in conclusory fashion, Virginia's "impressions of and discussions with [Perry] were relevant both to [Perry's] relationship with [her] and events that occurred in his life" and the court should have had "the benefit of the calendars and notes" to properly make its finding about the "'continuing relationship'" between his mother and Perry. Such a cursory effort amounts to a waiver of the issue. (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830 ["The absence of cogent legal argument or citation to authority allows this court to treat the contentions as waived"].)

Stover's claim the court erred by admitting into evidence the billing records of Perry's trust attorney is similarly devoid of content or context. His specific complaint is the billing records were not produced until the day the trust attorney testified at trial, and thus he was unfairly surprised by them. He offered no detail or relevant citation to the record, failed to explain how the content of the billing records differed from what he expected—although he implied there was deceptive backdating of an entry reflecting the trust attorney's preparation of a letter to Perry's doctor—and failed to assert the content of the billing records was prejudicial. This waives the issue. (*In re Marriage of Falcone & Fyke, supra*, 164 Cal.App.4th at p. 830; *Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856 ["If a party fails to support an argument with the necessary citations to the record . . . the argument [will be] deemed to have been waived"].)

Stover's final evidentiary contention fares no better. He contends the court erred by overruling his hearsay objection to Cynthia's testimony about her conversation with a representative of Accent On Seniors—a residential care referral company. But he

25

describes the disputed evidence as merely "a number of questions concerning what a person working for Accent On Seniors did or did not say to [Cynthia]." Based on that description, we cannot even discern the evidence was hearsay, let alone that its mysterious content might have been prejudicial to Stover. The argument is unsupported by either citation to the record or to any legal authority. It is waived.

*7. Standing*

Finally, Stover complains about what he contends are the court's "irrelevant" findings relating to standing, which were included in its statement of decision. As Stover acknowledges, his standing to pursue the claims asserted in his petition was a disputed issue. In fact, his amended petition specifically alleged although Virginia was "not a petitioner in this action . . . she is aligned with [Stover] in his claims set forth herein." Moreover, the amended petition specifically relied on the allegations Stover's mother "is 90 years old, in fragile health and stays at home," "[s]he was [Perry's] closest living relative" and "[g]iven her delicate health, however, she is not an appropriate candidate to prosecute this action" as facts establishing his standing to maintain the claims alleged.

Given Stover's effort to rely on Virginia as a basis to claim standing, it is not surprising the court felt it necessary to address the issue in some depth. Ultimately, what the court found was Stover had "standing to bring this action in his own behalf as a beneficiary of the Trust as a result of his specific bequest, albeit the bequest is not of large size and his standing is tenuous." However, he "does not have the right to assert claims on behalf of [Virginia]."

Stover contends the court's characterization of his standing as "'tenuous'" demonstrates it erroneously focused on the "extent, rather than the existence, of [his] legal standing," and reflected its "apparent belief . . . that [he] had an ulterior purpose of raiding [Perry's] estate simply for the money."

26

We agree with Stover's assertion the court's reference to his standing as "tenuous" is irrelevant.  But we will certainly not infer—based on no evidence at all—it reflected some allegedly improper conclusion about his ulterior motives.  And having agreed the reference is irrelevant we need not address the matter further.

## DISPOSITION

The judgment is affirmed and the Padayaos' motion to strike a portion of Stover's opening brief is granted.  The Padayaos are entitled to recover their costs on appeal.

THOMPSON, J.

WE CONCUR:

O'LEARY, P. J.

ARONSON, J.

27